JOURNAL ENTRY AND OPINION
{¶ 1} Appellant Alexander Rodriguez appeals from a judgment of the common pleas court entered pursuant to a jury verdict finding him guilty of rape and gross sexual imposition. On appeal, he assigns the following errors for our review:
 {¶ 2} "I. Appellant's conviction for rape was against the manifest weight of the evidence where the state failed to offer any evidence of force."
 {¶ 3} "II. Appellant's convictions are against the manifest weight of the evidence."
 {¶ 4} "III. The trial court erred in allowing the State of Ohio to call a rebuttal witness during its case-in-chief and use that witness to appeal to the emotions of the jury."
 {¶ 5} "IV. Mr. Rodriguez was denied due process of law when the trial court failed to present a jury question to counsel and formulated and presented a response to the jury."
 {¶ 6} "V. Mr. Rodriguez was afforded the ineffective assistance of counsel when counsel failed to adequately investigate the charges against the defendant and counsel failed to zealously advocate the appellant's position at trial."
 {¶ 7} Having reviewed the record and pertinent law, we reverse the judgment of the court and discharge Rodriguez. The apposite facts follow.
 {¶ 8} The record reflects the Cuyahoga County Grand Jury indicted Rodriguez for rape, kidnapping, and gross sexual imposition. Rodriguez pled not guilty to the indictment, and on September 30, 2002, a jury trial followed.
 {¶ 9} At the jury trial, it was revealed Rodriguez and Dilillo met on June 21, 2002 at a religious retreat at St. Borromeo Church. At the end of the retreat they exchanged e-mail addresses and promised to stay in touch. Following the retreat they exchanged e-mails almost daily in which they discussed their respective religious callings and past personal relationships. Their daily correspondence via e-mail culminated in Rodriguez inviting Dilillo to attend an all-night adoration at St. John's Cathedral being held on June 28, 2002.
 {¶ 10} On the evening of June 28, 2002, Rodriguez arrived late to Dilillo's home. Since he was late, Dilillo suggested they go to a nearby park instead of Mass.
 {¶ 11} After returning from the park, they returned to her home. They sat on a couch in the enclosed front porch of Dilillo's home. Rodriguez asked to kiss Dilillo and she consented. The two kissed for a while and Dilillo stated at some point Rodriguez inserted his finger into her vagina. She stated she was shocked, but did not say anything. This episode was interrupted when Dilillo's grandmother, who lives across the street, came to visit. Dilillo talked with her grandmother for a few moments and then went back to sit on the couch with Rodriguez.
 {¶ 12} Dilillo stated Rodriguez started kissing her again and told her if she loved him she would have sex with him. She responded if he loved her, he would respect her wishes not to engage in sexual relations. At this point, Dilillo stated Rodriguez asked to see her bedroom. At first she said no, but agreed when he promised not to do "anything sexual."
 {¶ 13} Once in the bedroom, Dilillo stated she sat on her bed while Rodriguez played with a keyboard beside her bed. She testified Rodriguez eventually came over to the bed, got on top of her, started kissing her, and after a while inserted his finger into her vagina. She stated she protested immediately, but Rodriguez ignored her and kept his finger inserted for almost ten minutes. She stated she told him to stop because she did not want to have sex; he told her she was not chaste and was not a virgin. She said Rodriguez continued to rub against her for about a minute and then stopped when she tried to push him off.
 {¶ 14} Dilillo testified Rodriguez then asked her to give him a "hand job." She stated she rubbed his penis for about a minute and then left the room. She said he followed her downstairs, and she asked him to leave.
 {¶ 15} After asking Rodriguez to leave, Dilillo testified she received a telephone call from her mother, who, along with Dilillo's father, were away for the weekend. She stated her mother was calling to see if everything was okay at the house. She testified she did not tell her mother about the events.
 {¶ 16} After talking with her mother, she said she looked outside and saw Rodriguez sitting in his car in the driveway. She went out and sat in the car with him. She stated he gave her a stick of chewing gum; they began kissing, and later she fell asleep. Dilillo stated she went back into her house about 2:30 A.M., after spending approximately three hours with Rodriguez.
 {¶ 17} When Dilillo awoke the next morning, Rodriguez was still in his car in her driveway. She went outside and talked with him for about two hours. Rodriguez then wrote a note which he asked her to give to her brother, then left.
 {¶ 18} The next day, Dilillo spoke with her friend and told her what had happened. Her friend suggested maybe he had drugged her with the gum. Thereafter, she went to the hospital to find out about the potentiality of being drugged. While there, a rape kit was performed.
 {¶ 19} After the trial, the jury returned a verdict of guilty to rape, not guilty to kidnapping, and guilty to gross sexual imposition. The trial court imposed a four-year term of incarceration for the rape count and a twelve month term of incarceration for gross sexual imposition, both to run concurrently. Rodriguez now appeals.
 {¶ 20} Though worded as a manifest weight argument, Rodriguez in his first assigned error argues the evidence presented at trial was insufficient to support his rape and gross sexual imposition conviction because there was no evidence of force.
 {¶ 21} A challenge to the sufficiency of evidence supporting a conviction requires the appellate court to determine whether the State met its burden of production at trial.[1] On review for legal sufficiency, the appellate court's function is to examine evidence admitted at trial and determine whether such evidence, if believed, would convince the average person of the defendant's guilt beyond a reasonable doubt.[2] In making its determination, an appellate court must view the evidence in a light most favorable to the prosecution.[3]
 {¶ 22} To prove rape pursuant to R.C. 2907.02(A)(2) the prosecutor must establish that the accused "engaged in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Sexual conduct includes, inter alia, "vaginal intercourse between a male and a female. Penetration, however slight, is sufficient to complete vaginal intercourse."[4] Pursuant to R.C.2907.05(A)(1), gross sexual imposition prohibits "sexual contact with another when the offender purposely compels the other person to submit by force or threat of force." Sexual contact is defined as: "touching of any erogenous zone of another, including without limitation the thigh, genitals, buttock, [or] pubic region for the purpose of sexually arousing or gratifying either person."[5]
 {¶ 23} Pursuant to R.C. 2901.01(A), "force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." A defendant purposely compels his victim to submit by force or threat of force when he uses physical force against the victim, or creates the belief that physical force will be used if the victim does not submit.[6] The element of force can be inferred from the circumstances surrounding the sexual conduct and is established if it is shown that the victim's will was overcome by fear or duress.[7]
 {¶ 24} In Schaim, the Supreme Court of Ohio upheld the court of appeals' reversal of appellant's rape conviction because no evidence of force was present. In Schaim, the defendant was indicted on two counts of forcible rape involving his adopted adult daughter, Rhonda Schaim, one count of gross sexual imposition involving his younger daughter, Leisa Schaim, and two counts of sexual imposition involving an employee, Linda Muncie. Rhonda testified her father had vaginal intercourse with her in June 1988 and September 1988, and Schaim was tried on two counts of forcible rape pursuant to R.C. 2907.02(A)(2) based on these incidents. Rhonda was twenty years old at the time of both incidents, and testified that she did not consent. She also testified as follows: "He didn't force me, but he — it had started from such a long time back, that the way he had brought me up and the way he had started with me, I felt like if I didn't do it that I would be punished, `cause every time that he asked me to do something and I wouldn't, it would be held against me. I wouldn't be able to go out. I would be limited. So I felt like if I didn't do it, I would be punished for it.'"[8]
 {¶ 25} On the above facts the Supreme Court of Ohio concluded a pattern of incest is not always a substitute for the element of force required by R.C. 2907.02(A)(2).[9]
 {¶ 26} In reaching that decision, the Supreme Court revisited Statev. Eskridge,[10] where the court addressed the case of a father who had vaginal intercourse with his four-year-old daughter. In Eskridge, the court recognized coercion is inherent in the parent-child relationship, and under those special circumstances force need not be overt and physically brutal, but can be subtle and psychological.[11] However, the Court refused to apply the same rationale to an adult. The Court stated a woman over the age of majority is not compelled to submit to her father in the same manner as is a four-year-old girl, because she is no longer completely dependent on her parents, and is more nearly equal in size, strength, and mental resources.[12]
 {¶ 27} In the instant case, the alleged conduct was between two adults, Dilillo age 19, and Rodriguez age 24; consequently, the element of force cannot be inferred.
 {¶ 28} Dilillo never testified that Rodriguez threatened her or used force. We also note Dilillo initially told the police Rodriguez carried her to the bedroom, but later admitted she went to the bedroom on her own. At no time did Dilillo indicate that Rodriguez forced her. Everything in this record suggest consensual behavior between two adults. We are reminded that Dilillo consented to giving Rodriguez a "hand job."
 {¶ 29} Furthermore, after Dilillo realized Rodriguez had not left, but was sitting in his car in her driveway, she voluntarily went out, entered the car, accepted chewing gum, resumed kissing, fell asleep, and did not re-enter her house until 2:30 A.M. the next morning. Dilillo spent approximately three hours in the car with Rodriguez.
 {¶ 30} After waking the following morning and realizing Rodriguez was still in his car in the driveway, Dilillo went outside and spent two hours talking with him. Dilillo's first e-mail to Rodriguez later the same day, began with her apologetically stating "I don't really know what to say or think. I just feel guilty at what I did."[13] Later that day they spoke by telephone and agreed to meet at her home. Finally, on cross examination where the following exchange took place summarizes Dilillo's inconsistent behavior and demonstrates a lack of force at best:
 {¶ 31} "Q. So, Mary Ann, it's a fair statement that during this whole evening of Friday the 28th Alex was kissing you and you were kissing him back, correct?
 {¶ 32} "A. Yeah.
 {¶ 33} "Q. And this other time when you testified that you touched him he never took your hand to place it on himself, did he?
 {¶ 34} "A. No.
 {¶ 35} "Q. And, again, he never picked you up and carried you anywhere, did he?
 {¶ 36} "A. No."
 {¶ 37} In the absence of proof, either direct or by inference, that Rodriguez purposely forced Dilillo to submit to sexual conduct, we must conclude the State has failed to prove an essential element of its case. This defect in the State's case requires a reversal and as such, results in Rodriguez being discharged.
 {¶ 38} Having sustained Rodriguez's first assigned error it becomes unnecessary to address the remaining assigned errors.
Judgment reversed; Rodriguez discharged.
This cause is reversed; appellant discharged.
It is, therefore, ordered that said appellant recover of said appellee his costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Frank D. Celebrezze, JR., J., concur;
Ann Dyke, J., concurs in Judgment Only.
[1] State v. Thompkins (1997), 78 Ohio St.3d 380.
[2] Id.; State v. Fryer (1993), 90 Ohio App.3d 37.
[3] Id. at 43.
[4] R.C. 2907.01(A).
[5] R.C. 2907.01(B).
[6] State v. Schaim (1992), 65 Ohio St.3d 51, 55.
[7] Id. State v. Smelcer (1993), 89 Ohio App.3d 115, 126.
[8] State v. Schaim (1992), 65 Ohio St.3d 51.
[9] Id.
[10] (1988), 38 Ohio St.3d 56.
[11] Id. at 58-59.
[12] State v. Schaim (1992), 65 Ohio St.3d 51, 55.
[13] Trial Transcript P. 327.