[Cite as *State v. Bentz*, 2017-Ohio-5483.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

**STATE OF OHIO,**

      **PLAINTIFF-APPELLEE,**               **CASE NO. 1-16-17**

      **v.**

**JUSTIN A. BENTZ,**                    **O P I N I O N**

      **DEFENDANT-APPELLANT.**

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CR 2015 0243**

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision:    June 26, 2017**

**APPEARANCES:**

    *Eric E. Willison* **for Appellant**

    *Todd C. Schroeder* **for Appellee**

**PRESTON, P.J.**

{¶1} Defendant-appellant, Justin A. Bentz ("Bentz"), appeals the April 14, 2016 judgment entry of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm in part and reverse in part.

{¶2} This case stems from allegations that Bentz, who was a police officer for the city of Lima, engaged in nonconsensual sex with 16-year-old K.A. on June 11, 2015. Bentz met K.A. through Kelli A. ("Kelli"), the girlfriend of Bentz's roommate, David Irwin ("Irwin"). K.A., Kelli's sister, was staying the night at the residence Irwin and Kelli shared with Bentz. On July 16, 2015, the Allen County Grand Jury indicted Bentz on: Count One of rape in violation of R.C. 2907.02(A)(2), a first-degree felony; Count Two of kidnapping in violation of R.C. 2905.01(A)(2), a first-degree felony; Count Three of sexual battery in violation of R.C. 2907.03(A)(2), a third-degree felony; Count Four of sexual battery in violation of R.C. 2907.03(A)(13), a third-degree felony; and Count Five of offenses involving underage persons in violation of R.C. 4301.69(A), a first-degree misdemeanor. (Doc. No. 3). Bentz pled not guilty to the counts of the indictment on July 23, 2015. (Doc. No. 221).

{¶3} On July 20, 2015, Bentz filed a motion for a bill of particulars, which the State provided on August 11, 2015. (Doc. Nos. 8, 17). The State filed an amended bill of particulars on November 5, 2015. (Doc. No. 119).

{¶4} On January 21, 2016, Bentz filed a motion to dismiss Count Four of the indictment. (Doc. No. 184). In that motion, Bentz argued that (1) he was not a "peace officer" at the time of the alleged offense or (2) R.C. 2907.03(A)(13) is unconstitutional. (*Id.*). On January 21, 2016, Bentz filed a motion in limine to exclude the testimony of the Sexual Assault Nurse Examiner ("SANE"), Ronda Norris ("Norris"). (Doc. No. 185). The State filed memorandums in opposition to Bentz's motion to dismiss and motion in limine on February 4, 2016. (Doc. Nos. 187, 188).

{¶5} On February 8, 2016, the trial court denied Bentz's motion to dismiss and motion in limine. (Doc. Nos. 191, 192).

{¶6} The case proceeded to a bench trial on February 16 and 17, 2016. (Feb. 16-17, 2016 Tr., Vol. I, at 1); (Feb. 16-17, 2016 Tr., Vol. II, at 309). The trial court found Bentz guilty of all of the counts of the indictment on February 23, 2016. (Doc. No. 221); (Feb. 23, 2016 Tr. at 5-7). The trial court filed its "judgment entry of conviction" on February 24, 2016. (Doc. No. 221).

{¶7} On April 8, 2016, the State filed a motion conceding that the rape and sexual-battery offenses of which Bentz was found guilty are allied offenses of similar import and subject to merger. (Doc. No. 225). The State indicated in its motion that it elected to pursue the offense of rape for purposes of conviction and sentencing. (*Id.*). Bentz filed a memorandum in opposition to the State's motion

arguing that the kidnapping offense of which he was found guilty is an allied offense of similar import to the rape and sexual-battery offenses of which he was found guilty. (Doc. No. 226).

{¶8} The trial court held a sentencing and a sex-offender registration hearing on April 14, 2016. (Apr. 14, 2016 Tr. at 1, 31). The trial court agreed with the State's argument as to merger and merged Counts One, Three, and Four, and denied Bentz's motion requesting that Count Two be merged with those counts. (*Id.* at 24). The trial court sentenced Bentz to ten years in prison on Count One, four years in prison on Count Two, and 60 days in jail on Count Five. (*Id.* at 25-28); (Doc. No. 232). The trial court ordered that Bentz serve the terms for Counts One and Two consecutively, and ordered that Bentz serve the term for Count Five concurrently to Counts One and Two, for an aggregate sentence of 14 years. (*Id.* at 28-29); (*Id.*). The trial court also classified Bentz as a Tier III sex offender. (Apr. 14, 2016 Tr. at 31). The trial court filed its judgment entries of sentence and sex-offender classification on April 14, 2016. (Doc. Nos. 231, 232).

{¶9} Bentz filed a notice of appeal on April 20, 2016.[1] (Doc. No. 237). He raises five assignments of error for our review. For ease of our discussion, we will

---

[1] The parties waived oral argument in this case because neither party requested to present oral argument in accordance with Loc.R. 13. *See* Loc.R. 13(A) ("Failure to notify the Court in writing of counsel's intention to present oral argument by the date indicated on the notice of oral argument shall constitute a waiver of oral argument by counsel, or the party, if unrepresented.").

first address Bentz's third and fourth assignments together, followed by his first, second, and fifth assignments of error.

## Assignment of Error No. III

**The Trial Court Erred When it Convicted the Defendant of Kidnapping When There was no evidence of Force or Threat of Force or Flight. [R. R.221 [sic] and 250 Transcript of Verdict Hearing Pages [sic] 6 Lines 4-13]**

## Assignment of Error No. IV

**The Trial Court Erred when it Convicted the Defendant of all charges except RC 4301.69(A) Against the Manifest Weight of the Evidence. [R. R.221 [sic] and 250 Transcript of Verdict Hearing Pages 5-8 Lines 10-05]**

{¶10} In his third and fourth assignments of error, Bentz argues that his kidnapping conviction is based on insufficient evidence and that his rape, sexual battery, and kidnapping convictions are against the manifest weight of the evidence.

{¶11} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). As such, we address each legal concept individually.

{¶12} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional*

*amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

{¶13} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*,

10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶14} At trial, the State offered the testimony of 11 witnesses. First, the Chief of Police for the Lima Police Department, Kevin Martin ("Martin"), testified that Bentz was employed as a peace officer with the Lima Police Department. (Feb. 16-17, 2016 Tr., Vol. I, at 24-27). Martin testified that Bentz was fired from his employment on June 11, 2015 based on K.A.'s allegations against Bentz. (*Id.* at 29-30).

{¶15} Next, Norris was qualified as an expert witness in the areas of registered nursing and sexual-assault exams. (*Id.* at 56). Norris testified that, as part of her duties as a registered nurse with St. Rita's Medical Center Emergency Department, she handles the responsibilities of a SANE, and is to report to the hospital when a sexual-assault victim arrives at the hospital. (*Id.* at 44-45, 59).

{¶16} She testified that she was called to the hospital on June 11, 2015 to examine K.A. after she arrived at the hospital and alleged that she had been sexually assaulted. (*Id.* at 58-60). First, K.A. described to Norris "what happened." (*Id.* at 60-62). According to Norris, K.A. was "confused; appeared kind of confused. I

[sic] didn't really know * * * how to explain what had happened. She was having difficulty with naming certain parts of the body and what happened." (*Id.* at 62). Norris prepared a handwritten narrative as K.A. described the alleged assault. (*Id.* at 61). Norris identified State's Exhibit 14 as "a copy of her sexual assault examination," which includes her handwritten narrative. (*Id.* at 62-63). Norris read her handwritten narrative for the trial court,

"Was [sic] at my sister's house." "Was [sic] on Skype with one of my friends." ["]He, and then in parenthesis, because [Norris] asked * * * who he was, and she said * * * Justin Bentz, got home from work." "It was between 1:30 and 3:00 when this happened." ["]He got home around 1:00."

["]We were sitting on two separate couches." ["]He asked me if I wanted to watch a movie." ["]He asked me if I wanted to take a shot." ["]I'm only 16." ["]He said, * * * you would have to get up and grab it yourself, but it's already poured." "It was in the kitchen."

["]We…we were back in the livingroom [sic]." ["]He asked me if I wanted to take a second shot." ["]I laid on the kitchen floor because it was kicking in." ["]He helped me up * * * he picked me up and put me on the counter and started messing with me." ["]Started kissing me, and in parenthesis, because I asked where, cheek, neck,

and mouth.["] "He carried me into the bedroom." "He took my pants off." ["]I told him no." ["]He told me to be quiet."

["]I heard my sister's door open. I think her boyfriend was letting the dog out." "He told me to be quiet." ["]He put his boy parts in my girl parts." When patient was asked to clarify, "He put his junk in me." Patient appeared to have difficulty finding the words to use. That was in parenthesis.

"He gave me a towel and told me to clean myself off." ["]I told him no." ["]He used the towel and cleaned my stomach off." When patient was asked what he cleaned off the stomach, * * * "the stuff that comes out of the boy parts."

["]My sister came into the bedroom." ["]He told me to be quiet." ["]My sister came into the bedroom to look for me and it was pitch dark in the room so she didn't see me." ["]I should have screamed, but he told me to be quiet and he is a cop."

["]He told me to get in the closet while he was going to try to distract my sister." ["]I felt like * * * if I yelled, because he is a cop and owns a gun, he could shoot somebody." "My sister found me in the closet and all I had on was my tank top."

"When he got home from work he was all dressed up. I asked him why he was all dressed up and he said, 'I was at police...it was police stuff.'" "I don't know what * * * he is talking about but he said that I was small."

When patient starts talking about the drinking prior to the assault – "I don't know what took so long for him to pour the first drink. It took about five to seven minutes for him to pour it." "The first shot I took was in a frosted shot glass and the second shot * * * was in a tall boot shot glass that * * * said something about Texas."

(*Id.* at 63-65). (*See also* State's Ex. 14).

{¶17} Norris continued to question K.A. about the assault. (Feb. 16-17, 2016 Tr., Vol. I, at 65). K.A reported to her that neither party was bleeding and that Bentz ejaculated on her stomach. (Feb. 16-17, 2016 Tr., Vol. I, at 65). (*See also* State's Ex. 14). At that point, Norris conducted her physical examination of K.A. (Feb. 16-17, 2016 Tr., Vol. I, at 66-69). Norris testified that her report reflects that her visual examination of K.A. revealed that Norris had K.A. "remove her naval ring" and that she observed "a small cut to the 5th digit of her left hand." (*Id.* at 69). Next, Norris visually examined K.A.'s vaginal area for injuries in which she observed "some tearing to the posterior fourchette," "some bruising, some purple area bruising, to the hymen tissue," and "some blood tinged discharge coming from

the vagina." (*Id.* at 69-70). Norris described those injuries as acute and said they could be described as "trauma to the vaginal area." (*Id.* at 70). Norris identified State's Exhibits 15 through 21 as the photographs she took depicting K.A.'s injuries. (*Id.* at 70-76). Norris testified that she also collected blood and urine samples from K.A., which she provided to law enforcement. (*Id.* at 82).

{¶18} On cross-examination, Norris testified that her examination of K.A. was interrupted when law enforcement arrived to interview K.A. (*Id.* at 86-90). Norris testified that she could not "form an opinion as to whether or not it was consensual sex." (*Id.* at 91). Norris recalled that K.A. told her that she did not "know how she lost her pants in the course of all this" and that K.A. did not report "where she was when her pants were removed or she lost her pants." (*Id.* at 91-92). Norris testified that she did not ask K.A. "how" she became naked. (*Id.* at 92). Norris further testified that she did not smell the odor of alcohol on K.A. (*Id.*). Norris identified Defendant's Exhibit C as the "rape kit" that she prepared. (*Id.* at 97-98). According to Norris, she could not remove hair from K.A.'s pubic area as she is supposed to do as part of the "rape kit," "because she didn't have any." (*Id.* at 93-94). Norris described K.A.'s "emotional state":

> Confused. Not quite sure what happened, as far she says that she, you
>
> know, she was having difficulty naming things. She didn't know how

to name things to me. Upset because she said that she was a virgin up until then.

(*Id.* at 94). She also described K.A. as "tearful at times." (*Id.* at 95).

{¶19} Norris testified that her report reflects only statements made to her by K.A. while she was speaking privately with K.A. (*Id.* at 101). According to Norris, the crime-victim advocate was also present. (*Id.*). In other words, law enforcement was not present in the room while she was interviewing K.A. and generating her written report. (*Id.* at 101-102). Norris asserted that she does "not take documentation when the police are in the room." (*Id.* at 102). According to Norris, the statement K.A. provided her is consistent with the statement K.A. provided law enforcement. (*Id.* at 105).

{¶20} As its next witness, the State offered the testimony Tiffany Paugh ("Paugh"), a criminalist in the toxicology department of the Ohio State Highway Patrol Crime Laboratory. (*Id.* at 112-113). Paugh testified that she examined K.A.'s blood sample to ascertain its alcohol concentration. (*Id.* at 115). Her examination revealed that K.A.'s blood-alcohol concentration was "zero point zero six four (0.064) grams per one hundred (100) milliliters of alcohol, ethanol in whole blood." (*Id.* at 116-117). Paugh identified State's Exhibit 23 as a copy of her report reflecting her findings. (*Id.* at 117).

{¶21} Eric Fashano-Soltis ("Fashano-Soltis"), a criminalist with the Ohio State Highway Patrol Crime Laboratory, testified on behalf of the State. (*Id.* at 119-120). Fashano-Soltis testified that he examined K.A.'s urine sample for the presence of drugs. (*Id.* at 121). He identified State's Exhibit 25 as a copy of his report reflecting his analysis of K.A.'s urine sample. (*Id.* at 125). Fashano-Soltis testified that his examination revealed that K.A.'s urine sample "was actually negative for all twelve (12) drug classifications." (*Id.* at 124). On cross-examination, Fashano-Soltis testified that he did not test K.A.'s urine sample for the presence of alcohol. (*Id.* at 126).

{¶22} Next, Wyatt Stahl ("Stahl"), age 18, testified that he is "really good friends" with K.A. (*Id.* at 150-151). Stahl testified that he was Skyping with K.A. from the evening of June 10, 2015 into the morning of June 11, 2015. (*Id.* at 151-152). Stahl testified that he stopped Skyping with K.A. "about 1:00 am or 1:30 am." (*Id.* at 152). According to Stahl, it did not appear to him that K.A. was consuming alcohol while they were Skyping, and the two did not have "any sexually inappropriate communications" during that Skype. (*Id.* at 153). However, he testified that he "probably" would not recall if there was "any sort of sexual conversation or communication" between him and K.A. (*Id.*). Stahl recalled that another male was present during his Skype with K.A. but he "didn't see him" because "he was in a different room watching TV." (*Id.*).

{¶23} On cross examination, Stahl testified that K.A. "occasionally" drinks alcohol because he has "heard stories" or K.A. "told" him about drinking alcohol. (*Id.* at 156).

{¶24} Detective Jack Miller ("Detective Miller") of the Shawnee Township Police Department testified that he investigated K.A.'s sexual-assault allegations against Bentz. (*Id.* at 162-163). Detective Miller first encountered K.A. at the St. Rita's Medical Center Emergency Department where he interviewed K.A. (*Id.* at 164). After interviewing K.A. at the hospital, Detective Miller interviewed other individuals identified as potential witnesses. (*Id.* at 164-165, 167).

{¶25} On cross-examination, Detective Miller testified that he has investigated three rape cases, including cases involving "false rape allegations." (*Id.* at 174, 177-178). Detective Miller characterized as a "fair statement" the following statement regarding false rape allegations:

> The most frequent context and motive for the fabricated rape is
>
> consensual sex with an acquaintance that led to some sort of problem
>
> for the accuser or could lead to some sort of problem for the accuser.
>
> For example, boyfriend, family, parents.

(*Id.* at 174-175). He testified that people falsely accuse others of rape when those people want to avoid facing the consequences of their actions. (*Id.* at 175). When presented with the following scenario:

So, as an example in this case we know that [K.A.] was being taken home by her sister * * * I mean there's a question whether she was going home or police department [sic]. But we know that [Bentz's] roommate is saying that the sister said, "Come on, I'm taking you home." So let's assume that she was going home. So if she was going home she would have to explain to her parents what they were doing there at three-thirty or four o'clock in the morning, how come [sic] they came home at that time.

Well, and then in the meantime her sister is with her so she would also be explaining to their parents exactly what happened. So eventually the sister is going to say, well, she came out of [Bentz's] room and she didn't have any pants on[.] * * * So she would have to explain to her parents what she was doing in [Bentz's] room without any pants on. That would be a little awkward to explain, wouldn't you agree?

Detective Miller agreed "that would be certainly an awkward conversation." (*Id.* at 175-176).

{¶26} Detective Miller testified that he and another law enforcement officer entered the exam room of the hospital in which K.A. was being examined by Norris. (*Id.* at 178). He testified that they interviewed K.A. regarding her allegations and

that the interview was recorded. (*Id.* at 179). Detective Miller identified Defendant's Exhibit J as a transcript of that recorded interview. (*Id.* at 183). (*See* Defendant's Exhibit J). Detective Miller testified that he heard Norris's testimony and indicated that, despite her testimony that she was not taking notes while law enforcement was interviewing K.A., he saw Norris taking notes during that time. (Feb. 16-17, 2016 Tr., Vol. I, at 178-179). According to Detective Miller, Norris used the same language in her report which was communicated during law enforcement's interview of K.A. (*Id.* at 186-187). Detective Miller admitted that K.A. was not consistent with her account as to how and when she became "naked." (*Id.* at 187-188).

{¶27} Next, K.A., who was 16 years old when the incident occurred, is five-foot-two-inches tall and weighs 98 pounds, testified on behalf of the State. (*Id.* at 197-198). She testified that she occasionally saw Bentz when she visited her sister at the residence Kelli and Irwin shared with Bentz. (*Id.* 200-201). According to K.A., she had brief contact with Bentz "maybe four (4) times" prior to June 11, 2015 and engaged in conversations with him in which he would have had reason to know that she was 16 years old. (*Id.* at 201-202). She testified that she knew Bentz was a police officer. (*Id.* at 201).

{¶28} She testified that she decided to spend the night of June 10-11 at the residence with Kelli and Irwin. (*Id.* at 202). Eventually, Kelli and Irwin went to

bed, leaving her alone in the main area of the residence. (*Id.* at 203). K.A. Skyped with Stahl on Kelli's i-Pad from "about 10:30" p.m. until "around 1:00" a.m. (*Id.* at 204-205). She did not consume any alcohol that night until that point. (*Id.* at 205-206). She admitted that she had previously tried alcohol, but asserted that she had never been intoxicated. (*Id.* at 206). While K.A. was Skyping with Stahl, Bentz returned home. (*Id.* at 207). After she ended her Skype with Stahl, she talked with Bentz about Kelli and Irwin's relationship, and Bentz opined to K.A. "that [the relationship] wasn't going to last because of country concert." (*Id.*). K.A. testified that Bentz asked her if she wanted to watch a movie to which she responded "that's fine." (*Id.* at 209).

{¶29} According to K.A., after the movie started, Bentz asked her if she wanted to take a shot of alcohol, to which K.A. testified that she "said no at first, but then [she] ended up saying yeah." (*Id.* at 209-210). She testified that Bentz went to the kitchen, prepared the shot, came back into the living room, and told her that "he couldn't bring it into the livingroom [sic], but then he said it was already poured." (*Id.* at 211-212). K.A. testified that she went to the kitchen and drank the shot of alcohol and returned to the living room to continue watching the movie. (*Id.* at 212). K.A. testified that Bentz asked her if she wanted to take a second shot of alcohol, to which she agreed, and Bentz poured the second shot of alcohol for her. (*Id.* at 212-213). She testified that she consumed "four (4) maybe five (5)" shots of

alcohol. (*Id.* at 213). According to K.A., Bentz was also drinking shots of alcohol. (*Id.* at 213-214).

{¶30} K.A. testified, "I started feeling it after the second one. That's when it like…I ended up laying on the floor because I could not make my way to the living room." (*Id.* at 214). She described her vision as "blurry." (*Id.* at 215). She testified that she tried to get up but she could not. (*Id.* at 216). Because she could not get up, Bentz "tried to help [her] up and then [she] started to fall, but then he caught [her]." (*Id.* at 216). According to K.A., when Bentz "caught" her, "[h]e touched [her] butt and then started kissing [her]. And then he picked [her] up and put [her] on the counter." (*Id.* at 216). Bentz continued kissing her while she was on the counter. (*Id.*). K.A. testified that she was impaired from the alcohol because she "wasn't like fully there. [She] was like in and out." (*Id.* at 217).

{¶31} From there, Bentz "picked [her] up" and "carried" her to his bedroom and laid her on his bed. (*Id.* at 217-218). She testified, "I just know that he carried me. I don't know exactly how" because she "was in and out." (*Id.* at 217). She remembered that her pants and underwear were off while she was on Bentz's bed, but she did not recall when those items were taken off. (*Id.* at 218). K.A. testified,

> The next thing I remember was he was on top of me and then I…I told
> him no when like he came in, but then after that I remember him being
> on top of me and somebody opening my sister's door. And then I told

> him he might as well stop because I had a feeling it was [Irwin] and that he would tell Kelli anyways. And he goes, "No, he won't, I know [Irwin]."

(*Id.* at 219).

{¶32} According to K.A., that Bentz was a police officer "concerned" her because,

> A time I stayed at their house before that I wanted to lock the front door and then he told me no because he wanted somebody to try to break in so he can shoot them. So I was thinking about that and the fact that he's a cop and he has a gun and he said he wanted to shoot somebody, so I figured if I yelled or anything then something would happen to either me or Kelli or [Irwin].

(*Id.* at 220).

{¶33} Irwin entered the room while Bentz was on top of K.A. (*Id.* at 221). According to K.A., when Irwin "opened the door [Bentz] was still on top of [her] because that's when [Bentz] told [her] to be quiet. And then [Irwin] said that he already seen [sic] [her] and * * * [Irwin] seen [sic] that [Bentz] was on top of me, but [Irwin didn't know it was me, so [sic]." (*Id.*).

{¶34} K.A. testified that Bentz left the room "to go distract [Kelli] and [Irwin]." (*Id.*). According to K.A., Bentz told her to "get into the closet" while

Bentz went to "distract them." (*Id.*). She testified that she went into the closet because Bentz was "a cop and [she did not] want to risk him hurting [her], or Kelli and [Irwin]." (*Id.* at 223). She was wearing only her tank top when she went into the closet. (*Id.*). K.A. testified that Kelli found her in the closet. (*Id.* at 224). According to K.A., she "ended up helping [herself] out of the bedroom because [Kelli] was yelling." (*Id.* at 224).

{¶35} After Kelli found K.A. in the closet, K.A. and Kelli left the residence and went to the police station. (*Id.*). On their way to the police station, they were stopped for speeding. (*Id.* at 225). K.A. told the officer who stopped them about the incident. (*Id.*). From there, K.A. was transported to the police station, then the hospital. (*Id.*).

{¶36} On cross-examination, K.A. testified that she is homeschooled by her mother but did not know if she was a junior or senior in high school. (*Id.* at 228). Because she was homeschooled, K.A. maintained part-time employment with a cleaning service for which she was "paid under the table." (*Id.* at 231). She testified that she spent her earnings on "chewing tobacco," which she had been doing "for a couple of years." (*Id.*). She testified that she has "drank [alcohol] before" but that she does not "drink all the time." (*Id.* at 231-232). She admitted to "sneaking drinks at family gatherings." (*Id.* at 232). K.A. identified Defendant's Exhibit H as a "download of a Jack's Daniel's bottle from [her] Facebook" from October 10, 2013

in which she wrote under the picture, "'This sucks. LOL. But it's better than nothing.' Smiley face. And * * * tagged [her] sister in it." (*Id.* at 233). However, K.A. denied that she drank that alcohol; rather, she just took a picture of the bottle and posted it to her Facebook because she "wanted to seem cool for [her] friends." (*Id.* at 233-234).

{¶37} K.A. denied telling Kelli that she thought Bentz was "cute" or "hot," and denied telling Bentz on two occasions that she was "going to go into his bedroom * * * to cuddle with him." (*Id.* at 227-228). She testified that, on June 11, 2015, when Bentz arrived at the residence after work, K.A. asked him "'Why are you all dressed up?'" to which Bentz responded, "'It's cop stuff.'" (*Id.* at 235). K.A. did not recall whether Bentz was playing a video game or whether she asked him to watch TV. (*Id.*). According to K.A., after she stopped Skyping with Stahl, Bentz asked her if she wanted to watch a movie but she could not recall what movie he selected. (*Id.* at 236). K.A. and Bentz were sitting on separate couches. (*Id.*). K.A. identified Defendant's Exhibit K as a drawing depicting the layout of Kelli Irwin and Bentz's residence. (*Id.* at 237).

{¶38} K.A. testified that Bentz asked her if she wanted a shot of alcohol about ten minutes into the movie. (*Id.* at 238-239). According to K.A., she initially told Bentz that she did not want a shot of alcohol but "then [she] changed her mind for some reason." (*Id.* at 239). She further testified that Bentz went to the kitchen

for about "five (5) to seven (7) minute[s]" and, when he returned, told her that he poured her a shot but that she would have "to go and get it though because he was not bringing it out into the livingroom [sic]." (*Id.* at 241). K.A. went to the kitchen to drink the shot of alcohol. (*Id.*). She testified that Bentz did not force her to drink the shot of alcohol. (*Id.* at 241-242). According to K.A., Bentz "stayed in the kitchen with [her] and took one right next to [her]." (*Id.* at 241). K.A. recalled "pouring one" shot of alcohol for herself. (*Id.* at 242). In sum, K.A. testified that she drank "between four (4) to five (5)" shots of alcohol. (*Id.*). Notwithstanding her statement to law enforcement that she drank two shots of alcohol, K.A. testified that she remembered at trial that she drank "four (4) to five (5)" shots of alcohol. (*Id.* at 243).

{¶39} K.A. testified that, after she drank the shots of alcohol, she "laid down on the carpet because [she] couldn't make it into the livingroom [sic]." (*Id.* at 244). According to K.A., Bentz then "helped [her] up and then [they] ended up" by the kitchen counter when she "started falling towards the counter [and] he caught [her]. Then that's when he started hugging [her], then he touched [her] butt, then he started kissing [her], picked [her] up, put [her] on the counter, started kissing [her] again, and then he pushed [her], and then ended up in his bedroom." (*Id.* at 244-247).

{¶40} K.A. testified that she did not know when her pants were removed; however, she testified that Bentz tried to have sex with her on the kitchen counter.

(*Id.* at 249, 254). K.A. did not tell law enforcement that Bentz tried to have sex with her in the kitchen. (*Id.*). K.A. did not tell Bentz to stop or scream for her sister or Irwin because she "was thinking about how he was a cop and how he told [her] he wanted to shoot somebody." (*Id.* at 250, 253). K.A. admitted that Bentz never threatened her with his gun or showed her his gun. (*Id.* at 250-251). She also admitted that Bentz did not have his gun with him while she was in the kitchen with Bentz. (*Id.* at 252). When asked about inconsistences between her testimony and the statement she provided to law enforcement, K.A. testified that she did not "remember anything from that night, even from after leaving the police [station]." (*Id.* at 253). K.A. testified that she did not remember Irwin and Kelli's dogs coming into the bedroom during the rape. (*Id.* at 255-256). However, she testified she remembered Irwin opening the door to the bedroom while Bentz was on top of her. (*Id.* at 256). K.A. testified that she did not say anything when Irwin opened Bentz's bedroom door because Bentz told her to be quiet. (*Id.* at 256-257).

{¶41} She testified that, when she exited the bedroom, Kelli and Irwin were in the kitchen with Bentz. (*Id.* at 259). She testified that she had only a shirt on when she came out of the bedroom. (*Id.*). She could not recall whether her sister called her "a fucking slut," but remembered telling Kelli that "nothing happened." (*Id.*).

{¶42} K.A. testified that Kelli tried to call 911 but either Irwin or Bentz "were yelling at her" and either Irwin or Bentz "made her turn the phone off." (*Id.* at 261). K.A. testified that Kelli told her "'[c]ome on, we're going home'" when they left the residence but, according to K.A., they "were supposed to go to the police station." (*Id.* at 260). K.A. testified that she did not mention the word "rape" until they were stopped by law enforcement for speeding. (*Id.* at 262-263). K.A. clarified that she told Kelli that Bentz raped her just prior to being stopped by law enforcement. (*Id.* at 263).

{¶43} Next, Special Agent Chris Hamberg ("Special Agent Hamberg") of the Ohio Bureau of Criminal Investigation ("BCI") testified that he and Special Agent Dave Hammond of BCI executed a search warrant at the residence. (*Id.* at 266-268). Special Agent Hamberg identified State's Exhibits 27 through 31 as photographs that he took depicting the residence on June 11, 2015. (*Id.* at 268-272).

{¶44} Dr. Robert Forney ("Dr. Forney"), the chief toxicologist of the Lucas County, Ohio Coroner's Office testified that he was requested to conduct a retrograde extrapolation to determine K.A.'s alcohol concentration at approximately 3:00 a.m. on June 11, 2015. (*Id.* at 297-280, 290-291). A retrograde extrapolation is a scientific analysis used to retroactively determine a person's alcohol concentration at a certain point in time. (*Id.* at 290). Dr. Forney identified State's Exhibit 23 as one of the documents that he relied on in conducting his retrograde-

extrapolation analysis, which reflected K.A.'s alcohol concentration at approximately 7:14 a.m. on June 11, 2015. (*Id.* at 292). Dr. Forney testified that he also relied on the following facts in his analysis: (1) that K.A. was 16 years old; (2) that K.A. is "five feet two inches, and weighing approximately ninety-two pounds"; (3) that K.A. "had a history of trying alcohol"; (4) that K.A. was sober at 1:00 a.m. on June 11, 2015; (5) that K.A. "began to consume shots of eighty proof tequila" at approximately 1:30 a.m.; (6) that K.A. "was unsure of the number of shots but estimated it at approximately five (5) shots"; (7) that K.A. "began to feel dizzy, had blurred vision, and had difficulty standing"; and (8) that "the alcohol consumption likely ended at or before 3:00 a.m." (*Id.* at 293-295).

{¶45} Dr. Forney identified State's Exhibit 33 as his retrograde-extrapolation report. (*Id.* at 295-296). Dr. Forney testified that he concluded that K.A.'s alcohol concentration at approximately 3:00 a.m. on June 11, 2015 "would have been between zero point one two [0.12] and zero point one nine [0.19] grams by weight of alcohol per one hundred millimeters." (*Id.* at 296). Dr. Forney testified that his report opines that "[b]etween 1:30 and 3:00 a.m. on June 11, 2015 [K.A.] would have been significantly intoxicated by the alcohol in her system and would have been obtunded and would not have been able to affectively resist the assault nor defend herself." (*Id.* at 297).

{¶46} On cross-examination, Dr. Forney admitted that the information that he relied on to conduct his retrograde-extrapolation analysis could have been inaccurate, which would impact the results of his analysis. (*Id.* at 298-306).

{¶47} The State recalled Detective Miller to the stand. (Feb. 16-17, 2016 Tr., Vol. II, at 315). He testified that Bentz was born on November 4, 1987 and that K.A. was born on July 21, 1998. (*Id.* at 316).

{¶48} As its next witness, the State called Patrolman Zachary Carpenter ("Patrolman Carpenter") of the Lima Police Department who testified that he conducted the traffic stop of the vehicle that Kelli was operating on June 11, 2015. (*Id.* at 316-318). Patrolman Carpenter identified State's Exhibit 34 as a video recording of the traffic stop, which was subsequently played for the trial court. (*Id.* at 319-320). (*See* State's Ex. 34).

{¶49} On cross-examination, Patrolman Carpenter testified that K.A. "was crying in the front seat" of the vehicle and when he asked her why she was crying she responded "that she was caught with Mr. Bentz." [2] (Feb. 16-17, 2016 Tr., Vol. II, at 323). While Patrolman Carpenter "was trying to reassure her and calm her down she started screaming that she was raped." (*Id.* at 324). Patrolman Carpenter explained that he turned his microphone off and on during the traffic stop because he did not think what he was reporting to his supervising officer, whom Patrolman

---

[2] The State recalled Patrolman Carpenter to the stand and he clarified that K.A. said that she was "found" with Bentz, not "caught" with Bentz. (Feb. 16-17, 2016 Tr., Vol. II, at 345).

Carpenter called to the scene, should be recorded. (*Id.* at 326). According to Patrolman Carpenter, K.A. appeared to be intoxicated. (*Id.* at 327). After obtaining Kelli's information, Patrolman Carpenter followed Kelli and K.A. to the Lima Police Department. (*Id.* at 326).

{¶50} Lieutenant John W. Bishop ("Lieutenant Bishop") of the Lima Police Department testified that he interviewed K.A. after Kelli and K.A. arrived at the Lima Police Department. (*Id.* at 329-330). He identified State's Exhibit 35 as a video recording of his interview of K.A., which was subsequently played for the trial court. (*Id.* at 331). (*See* State's Ex. 35).

{¶51} On cross-examination, Lieutenant Bishop identified Defendant's Exhibit G as a transcript of his interview of K.A. (Feb. 16-17, 2016 Tr., Vol. II, at 333). He testified that Kelli was in the interview room while he was taking K.A.'s statement because K.A. wanted Kelli "to be there with her." (*Id.* at 334). Lieutenant Bishop testified that K.A. mentioned that she only consumed two shots of alcohol. (*Id.* at 336). He testified that he did not notice the odor of alcohol coming from K.A. or think that she was intoxicated. (*Id.* at 336-337).

{¶52} Lieutenant Bishop testified that K.A. asserted during the interview that the rape was her "fault." (*Id.* at 337). He agreed that Defendant's Exhibit G reflects that K.A. stated, after declaring that the rape was her fault, "(Inaudibles) like me." (*Id.*); (Defendant's Exhibit G at 13). When asked whether K.A. was asserting that

the rape was her fault because she "just wanted *him* to like" her, Lieutenant Bishop agreed only that "she wants *someone* to like her." (Emphasis added.) (Feb. 16-17, 2016 Tr., Vol. II, at 337-338). He could not recall who she identified as wanting to like her. (*Id.* at 338). Lieutenant Bishop could not recall whether he saw Kelli respond to K.A.'s statements by putting "her finger to her mouth" as if to "shush" K.A. (*Id.* at 338-339). (*See also* State's Ex. 35). He agreed that K.A. told him that "Kelli doesn't like [K.A.]" (Feb. 16-17, 2016 Tr., Vol. II, at 339).

{¶53} Thereafter, the State moved to admit its exhibits, State's Exhibits 1 through 12 and 14 through 35 were admitted without objection, State's Exhibit 13 was admitted over Bentz's objection, and the State rested. (*Id.* at 348-357). Next, Bentz made a Crim.R. 29(A) motion, which the trial court denied. (*Id.* at 357-374).

{¶54} The defense called three witnesses. As its first witness, the defense called Kelli to testify. (*Id.* at 376). Kelli testified that she is still living with Irwin, and that she has been in a relationship with him for almost two years. (*Id.* at 377-378). Kelli identified Defendant's Exhibit D as a transcript of the statement she provided to Detective Miller. (*Id.* at 378-379). According to Kelli, Irwin discovered K.A. in the closet after Kelli instructed Irwin to return to Bentz's room and look for K.A. because Kelli "didn't trust" Bentz. (*Id.* at 379). After Irwin found K.A., Kelli went into Bentz's bedroom and saw K.A. "[i]n a fetal position" in the closet wearing only a tank top. (*Id.* at 380). Kelli told K.A. to "get up" and "grabbed her" to "g[et]

her up." (*Id.* at 380). K.A. followed Kelli into the kitchen after Kelli instructed K.A. to exit Bentz's room. (*Id.* at 383). According to Kelli, K.A. "stood there as [Kelli] threw things at [Bentz]." (*Id.* at 383). However, Kelli testified that K.A. "kept saying, 'He didn't do anything. We didn't have sex. He didn't do anything.'" (*Id.* at 384).

{¶55} Kelli testified that she dialed 911 but disconnected the phone "[b]ecause at that point in time [she] had no proof" that anything happened since K.A. was denying anything happened. (*Id.* at 384). Kelli testified that she left the residence with K.A. to take her to the police station but she told Irwin and Bentz that she was taking K.A. home. (*Id.* at 385). Kelli testified that K.A. did not tell her that Bentz raped her prior to being pulled over by Patrolman Carpenter. (*Id.*). K.A. did not mention that Bentz raped her until Patrolman Carpenter approached the car and began speaking with them. (*Id.* at 386). Kelli admitted that she "wasn't really sure" whether K.A. voluntarily had sex with Bentz. (*Id.* at 386-388). Indeed, she told Detective Miller, "'I kind of thought maybe it was a two-way thing, you know, they both did it. And then I could smell alcohol on her breath.'" (*Id.* at 386). (*See also* Defendant's Exhibit D).

{¶56} Kelli admitted that she did not want Bentz living with her and Irwin. (Feb. 16-17, 2016 Tr., Vol. II, at 388). She testified that Irwin and Bentz were

childhood friends and that Bentz had been living with Irwin for approximately five years. (*Id.*).

**{¶57}** Kelli testified that she admitted to Detective Miller that K.A. "sneaks" alcohol. (*Id.* at 389). Kelli denied calling K.A. a "slut" when she ordered her out of Bentz's bedroom. (*Id.* at 390). Kelli recalled a conversation she had with K.A. about two weeks prior to the incident regarding K.A. "cuddling up with [Bentz]." (*Id.* at 391). However, she could not recall the context of that conversation. (*Id.*).

**{¶58}** According to Kelli, Irwin got up around 3:00 a.m. to let the dogs outside. (*Id.*). Irwin went into Bentz's room to retrieve the dogs after the dogs ran into Bentz's bedroom, but Irwin did not see K.A. (*Id.* at 391-392). Kelli testified that K.A. said "[s]omething about they know[, t]hey see us" when Irwin went into Bentz's room. (*Id.* at 392). Kelli went into Bentz's room right after Irwin but did not hear K.A. say anything. (*Id.*).

**{¶59}** Kelli testified that Bentz never threatened anyone, including with his gun. (*Id.* at 393). Kelli admitted that Irwin also has guns. (*Id.* at 393-394). Kelli testified that she does not know why K.A. told Lieutenant Bishop that Kelli "hates her." (*Id.* at 382-383).

**{¶60}** On cross-examination, Kelli testified that, when Irwin returned from letting the dogs out, he expressed concern to Kelli that he could not find K.A. (*Id.* at 398). Kelli testified that, after searching the house for K.A., she knocked on

Bentz's door and asked if K.A. was in his bedroom, to which Bentz responded "no." (*Id.* at 399-400). Bentz then came into the kitchen where Kelli and Irwin were and Kelli told Irwin to "check [Bentz's] room." (*Id.* at 400). According to Kelli, Irwin returned and reported finding K.A. in Bentz's closet, which prompted Kelli to enter Bentz's room to see K.A. in Bentz's closet. (*Id.*). Kelli testified that K.A. "'looked scared,'" was in the fetal position, and started crying when she saw Kelli. (*Id.*). Kelli did not know what had happened but could smell alcohol coming from K.A.'s breath. (*Id.* at 401). Kelli testified that K.A. told her that Bentz "made her be quiet and crawl in the closet." (*Id.*). However, Kelli testified that K.A. stated that "nothing happened" as K.A. exited Bentz's room. (*Id.*).

{¶61} Kelli testified that she started to call 911 but disconnected the phone because Bentz "made her" by yelling at her and telling her to disconnect the phone. (*Id.* at 401-402). According to Kelli, Bentz denied "do[ing] anything" with K.A. and told Kelli that she was "going to get him fired." (*Id.* at 402).

{¶62} Kelli testified that she and K.A. then left the residence to go to the police station. (*Id.*). Kelli testified that she was "upset" and "focused on getting to the police station," which caused her to speed. (*Id.* at 402-403). Because Kelli was upset, she was "unable to comprehend or think about what [K.A.] was saying, but K.A. was talking during the car ride to the police station. (*Id.* at 403). Kelli testified that K.A. told Patrolman Carpenter what happened after he stopped them for

speeding, including that K.A. did not "yell" for help because she was "trying to protect [Kelli] and [Irwin] because K.A. knew that Bentz had a gun and he was a cop." (*Id.* at 404).

{¶63} Kelli testified that she told Detective Miller that "'the last time [K.A.] was over[, Bentz] had said something to her about cuddling with her[, but Kelli] didn't really take it serious[, she] just kind of thought maybe he was joking [a]nd [Irwin] said he was joking.'" (*Id.* at 405-406).

{¶64} On re-direct examination, Kelli testified that K.A. appeared "to be drunk" when she emerged from Bentz's closet because "[s]he was stumbling around." (*Id.* at 408). Kelli clarified that Bentz did not make her disconnect the phone when she started to call 911; rather, she disconnected the phone on her own because K.A. "was screaming 'nothing happened, nothing happened, nothing happened.'" (*Id.* at 408-409). Indeed, a 911 operator returned Kelli's call but she did not answer because she did not have any "proof by that time." (*Id.* at 409). Kelli clarified that K.A. never stated that she was raped until they were stopped by Patrolman Carpenter when K.A. told Patrolman Carpenter that she was raped. (*Id.* at 410).

{¶65} As its next witness, the defense called Irwin to testify. (*Id.* at 412). He testified that, on June 11, 2015, he got up around 3:00 a.m. to let the dogs outside. (*Id.* at 414). He testified that K.A. was supposed to be in his living room, but he did

not see her in the living room when he went to take the dogs outside. (*Id.* at 416). Irwin searched the house for K.A. but could not find her. (*Id.*). Irwin, knowing that Bentz was home, went in Bentz's room and told Bentz, "'I can't find K.A.'" (*Id.* at 416-417). When Irwin opened the door to Bentz's room, the dogs entered Bentz's room. (*Id.* at 417). According to Irwin, Bentz did not tell Irwin that K.A. was in his room and K.A. did not announce that she was in Bentz's room. (*Id.* at 417). Irwin then woke Kelli to inform her that he could not find K.A. (*Id.*). Irwin testified that Kelli searched the house and "opened up [Bentz's] door [but] didn't see [K.A.] was in there." (*Id.*). At that point, Irwin and Kelli went to the kitchen, then Bentz joined them in the kitchen. (*Id.* at 417-418).

{¶66} According to Irwin, he "heard a noise * * * back where the bedrooms are," which caused him to "walk[] back in [Bentz's] room and [K.A.] was sitting in the closet." (*Id.* at 418). According to Irwin, K.A. was wearing only a shirt and was kneeling so that her knees pulled the shirt down over her. (*Id.*). Irwin did not say anything to K.A. (*Id.*). Instead, Irwin went back to the kitchen and told Kelli that K.A. was in Bentz's closet. (*Id.*). According to Irwin, when K.A. came out into the kitchen, she looked "[l]ike, oh, shit, I just got caught," meaning that she was caught doing something wrong. (*Id.* at 419).

{¶67} Irwin testified that "[n]obody stopped [Kelli] from calling the police." (*Id.*). Rather, Irwin and Bentz told Kelli, "'Don't call the police'" because K.A.

"came out of the bedroom saying, 'Nothing happened, nothing happened, don't call the cops.'" (*Id.* at 420). Irwin testified that Kelli was upset and told K.A. "'to get dressed. I'm taking you home.'" (*Id.*). Irwin testified that he did not smell any odor of alcohol coming from K.A. (*Id.* at 420-421).

{¶68} Irwin testified that Kelli called him when Kelli and K.A. were stopped by Patrolman Carpenter and Kelli told Irwin that K.A. "said that she was raped and that's when they went to the police department." (*Id.* at 421). Irwin testified that Kelli wanted Irwin to make Bentz move out of the house, and "that morning after [K.A.] came out of the closet [Kelli] told [him] 'It's me or him,'" meaning that Irwin had to choose between Kelli and Bentz. (*Id.* at 422).

{¶69} On cross-examination, Irwin confirmed that Kelli called K.A. a "slut" when K.A. emerged from Bentz's bedroom. (*Id.* at 423). Irwin further confirmed that neither he nor Kelli saw K.A. in Bentz's bedroom when they initially searched for her. (*Id.* at 424-425). Irwin testified that Bentz did not confirm or deny that K.A. was in his bedroom when Irwin told Bentz that he could not find K.A. (*Id.* at 426).

{¶70} Irwin testified that he initially told Detective Miller that K.A. looked scared when Irwin discovered her in Bentz's closet. (*Id.* at 428). However, he clarified that he did not know what K.A. was scared of. (*Id.*). Irwin testified that he told Detective Miller that K.A. is "'very immature for her age physically and

mentally'" because she "'doesn't act like a 16 year old. She's 16 and looks like she's 13'" and acts like she is 13 years old. (*Id.*). Irwin testified that he saw two bottles of liquor on the kitchen counter and saw shot glasses in the kitchen. (*Id.* at 431).

{¶71} Irwin testified that Bentz remained at the house on June 11, 2015. (*Id.* at 433). According to Irwin, Bentz returned to his room after K.A. and Kelli left the residence. (*Id.*). Irwin testified that he asked Bentz "why he did what he did" and Bentz "just kind of shook his head" and did not say anything. (*Id.* at 432). Irwin recalled saying to Bentz "'this will be interesting'" as Bentz was leaving for work on June 11, 2015, and Bentz responding "'yeah, it should be.'" (*Id.* at 433).

{¶72} On re-cross examination, Irwin testified that he heard that K.A. told Detective Miller that she was afraid of Bentz because he had guns and was a cop. (*Id.* at 438). Irwin testified that he has guns but that K.A. is not afraid of him. (*Id.*). Irwin never saw Bentz threaten anyone with his guns. (*Id.* at 439). Irwin testified that he did not see "any indication that [K.A.] was in danger because of [Bentz]." (*Id.*). According to Irwin, Bentz admitted to him before Bentz left for work on June 11, 2015 that he "had sex" with K.A. (*Id.*). Bentz also stated to Irwin that he is "screwed if [K.A. and Kelli] go saying [he] raped [K.A.].'" (*Id.* at 440). Irwin assumed that K.A. consented to having sex with Bentz. (*Id.*).

{¶73} Bentz testified in his defense. (*Id.* at 444). Bentz testified that he first met K.A. when she and Kelli were painting the house that Bentz shared with Irwin and Kelli. (*Id.* at 447). After K.A. was introduced to Bentz, he engaged in small talk with her, including asking K.A. whether he could have some of her "chew" from her "can of chew," which he saw "sitting out." (*Id.* at 447-448). According to Bentz, Kelli later told him, "'My sister has the hots for you.'" (*Id.* at 448).

{¶74} On June 11, 2015, Bentz returned home from work and found K.A. Skyping with Stahl. (*Id.* at 449). Bentz testified, "While she was Skyping they got real quiet. I was in the room and I asked her if she wanted me to leave the room * * * [a]nd she said 'no, I'm just signing him dirty things.' And she said that [Stahl] didn't know sign language." (*Id.* at 450). When K.A. was done Skyping with Stahl, Bentz was playing a video game and K.A. complained that "she was bored watching [him] play a video game." (*Id.*). Bentz asked K.A. if she wanted to watch a movie to which she responded that she did, and Bentz turned on "Wonderland." (*Id.*). Bentz testified that he started the movie at 2:00 a.m. (*Id.* at 452).

{¶75} During the movie, K.A.

stated that she hopes that there's a lot of sex in the movie. She went

on to say that…it was about a week prior to this she had stayed over

and [Bentz] and [Irwin] had came [sic] home from the bar and

[Bentz's] girlfriend came over that night, and [K.A.] was telling

[Bentz on June 11, 2015] that '[K.A.] was going to come and crawl in bed with [Bentz on that previous occasion], but that bitch showed up,' referring to [Bentz's] girlfriend.

(*Id.* at 453).

{¶76} Bentz testified that "about ten minutes into the movie, about 2:10, she said, 'You should go pour me a shot.' And I told her she should go pour her own damn shot." (*Id.* at 455). According to Bentz, K.A. responded that "she didn't know where the alcohol was" so Bentz went to retrieve the alcohol—tequila—from the freezer, and K.A. followed him into the kitchen. (*Id.*). Bentz poured shots of tequila, and K.A. and Bentz drank a shot of tequila. (*Id.* at 455-456). Bentz testified that they then went back to watching the movie, and "[a]bout five minutes later she said 'we should take another shot.'" (*Id.* at 456). Bentz said, "'Okay, whatever'" and followed K.A. into the kitchen. (*Id.* at 456-457). K.A. poured two shots, which they drank, and then they "went back to watching the movie." (*Id.* at 457). Bentz testified that "about five minutes after that" K.A. suggested that they drink another shot of alcohol, Bentz followed K.A. into the kitchen, and watched K.A. pour two more shots of tequila, which they drank. (*Id.*). They went back to watching the movie when K.A. suggested that they again drink shots of alcohol. (*Id.*). K.A. "poured two (2) more shots. And after that shot [they] lingered in the kitchen * * * engag[ing] in conversation." (*Id.*). According to Bentz, in total, each consumed

four shots of tequila. (*Id.*). However, he testified that K.A. suggested drinking a fifth shot of alcohol to which Bentz declined because he had "'to get up for work in the morning.'" (*Id.* at 458).

{¶77} After Bentz declined drinking a fifth shot, K.A. went and sat on the carpet. (*Id.* at 458-459). According to Bentz, K.A. did not appear intoxicated because she did not have "any problem in motivating," and she did not "roll over or fall over" when she sat down. (*Id.* at 459). After K.A. sat down, Bentz told K.A. that she "'probably [does not] need to be taking another shot anyways.'" (*Id.*). According to Bentz, K.A. responded, "'[e]veryone thinks I'm so innocent. I'm not as innocent as * * * people think I am[,]" and she proceed to share stories with him as to why she is not innocent. (*Id.*).

{¶78} While K.A. was telling Bentz these stories, she got up from the carpeted area and began "moseying around," and "approache[d] [him] and says she needs a hug and * * * she just started hugging [him]." (*Id.* at 460). According to Bentz, he hugged her back and the hug lasted about 30 seconds when they "started kissing." (*Id.*). Bentz testified that he "picked her up and sat her on the counter" while they continued to kiss. (*Id.*). He continued to testify, "And then she hopped down from the counter and backed me away from the counter and pulled my athletic shorts and my boxers down to the floor and got on her knees and started performing oral sex on me." (*Id.*).

{¶79} He further testified, "She got up, took her pants and her underwear off. And then she bent over in the kitchen. We * * * were attempting to have sex while standing up," which "didn't work" because "[s]he's so much shorter and I was taller." (*Id.* at 461). Because "[i]t was apparent that that was not going to work out," "she turned around and [Bentz] picked her up. She wrapped her legs around [him] and [they] started having sex standing up." (*Id.*). He testified that "holding somebody having sex" "in the middle of the room" "was awkward," so "[s]he said '[l]et's go to your bedroom.'" (*Id.* at 462). Bentz testified that he "carried her to the bedroom and laid her on the edge of the bed" and they "continued to have sex." (*Id.*).

{¶80} While in Bentz's bedroom, K.A. asked if he had "'any lube'" because "she started drying up." (*Id.* at 463). Bentz went to the bathroom—about 30 feet from Bentz's bedroom—to retrieve some "dial lotion." (*Id.*). According to Bentz, K.A. sent him for "'lube'" a second time. (*Id.* at 464). Bentz went to the bathroom again, and, when he returned, he "didn't close the door all the way" causing it to stand "ajar an inch or two." (*Id.*). Bentz testified that K.A. "said 'close the door in case my sister hears us,'" so Bentz "pushed it a little farther" but he "wasn't real concerned about closing it." (*Id.*). Bentz testified that he "continued to have sex with her on the edge of the bed." (*Id.* at 465). "A few minutes into that she said 'let me get on top.' So [Bentz] crawled on to the bed and then she crawled on top of

[him] and straddled [him] and took her tank top and her bra off at this point * * * and then she started performing oral sex on [him] again." (*Id.*). According to Bentz, they continued to engage in sex acts. (*Id.*). Bentz testified that K.A. told him that "she had wanted this for awhile [sic]." (*Id.* at 465-466).

{¶81} Bentz testified that Irwin "opened the door and the dogs came in." (*Id.* at 466). Irwin asked Bentz how long he had been home and Bentz responded "'a little while,'" then Irwin asked Bentz if he knew where K.A. was but neither Bentz nor K.A. responded to Irwin. (*Id.*). After Irwin and the dogs left Bentz's bedroom, they "continued to have sex. [He] ended up finishing. [He] pulled out and finished on her stomach." (*Id.*).

{¶82} Bentz testified, "After that she actually pulled me down towards her and kissed me and asked if I was ready to go again, I told her 'in a little bit.' Then I walked around and got a hand towel out * * *, gave it to her and she cleaned herself off. I cleaned myself off. Threw it in the hamper." (*Id.* at 467). Right after they "got done cleaning up Kelli knocked and opened the door." (*Id.*). Bentz testified that Kelli asked if K.A. was in his bedroom to which he responded "no"; K.A. did not respond, and Kelli "closed the door and left." (*Id.* at 468).

{¶83} According to Bentz, K.A. came up with a plan where Bentz was to distract Kelli while K.A. would sneak into the bathroom so that K.A. could tell Kelli that she fell asleep in the bathtub. (*Id.*). Bentz testified that he "wasn't really

-40-

concerned about distracting Kelli" and "walked out of [his] room, went to the kitchen, [and] got a drink." (*Id.*). Bentz testified that he was not concerned about distracting Kelli because he "didn't even know that [K.A.] was only 16 so [he] was not concerned about anything." (*Id.*). Bentz testified that K.A. never said "no" or "stop"; rather, "[s]he was an active participant the entire time." (*Id.* at 469).

{¶84} Bentz testified that he saw Kelli go "towards" his bedroom and heard Kelli yelling, "You fucking slut." (*Id.*). Then, "Kelli came out into the kitchen, started screaming that she was only 16 years old, 'How could you do that.' Then she said 'I'm calling the cops.'" (*Id.*). Bentz testified that K.A. followed Kelli into the kitchen saying "nothing happened, nothing happened." (*Id.* at 470). "Kelli dialed 911 and [Bentz] and [Irwin] told her 'Don't call the police.' [K.A.'s] still saying 'nothing happened.' Kelli puts the phone up to her ear and as soon as she puts it up there [K.A.] started reaching for the phone to get it, so [K.A.] or Kelli takes the phone * * * and ends up hanging up." (*Id.*). Then, Kelli started punching Bentz and throwing things at him. (*Id.*). According to Bentz, Kelli said to K.A. "'Get in the fucking car, I'm taking you home,'" and they left. (*Id.*).

{¶85} Bentz testified that he reported to work on June 11, 2015 and was terminated that day based on K.A.'s allegations. (*Id.* at 445).

{¶86} On cross-examination, Bentz testified that K.A. consumed four shots of alcohol—tequila—within 20 to 30 minutes. (*Id.* at 486, 488). According to

Bentz, he did not feel intoxicated from the four shots of tequila that he drank. (*Id.* at 489). He testified that he did not think that K.A. was impaired from the shots of tequila. (*Id.* at 490).

{¶87} Bentz disagreed with Dr. Forney's timeframe regarding K.A.'s estimated level of intoxication because "of the absorption rate," meaning that K.A.'s body did not have enough time to absorb the alcohol between the time she consumed it and had sex with Bentz. (*Id.* at 491-492). Bentz testified that one of his Lima Police Department uniforms was hanging "on the door" to his bedroom because it "needed sewed." (*Id.* at 495-496).

{¶88} Thereafter, the defense moved to admit its exhibits, Defendant's Exhibits A through C, H, and K were admitted without objection, and Defendant's Exhibits D, G, and J were admitted over the State's objection. (*Id.* at 500-506). Bentz renewed his Crim.R. 29(A) motion, which the trial court denied. (*Id.* at 507-508). The State did not present any witnesses on rebuttal, and the matter was submitted to the trial court, which found Bentz guilty as to the counts of the indictment. (*Id.* at 546); (Feb. 23, 2016 Tr. at 5-7).

{¶89} Because Bentz does not challenge the sufficiency of the evidence supporting his rape and sexual-battery convictions, we will first review whether Bentz's rape and sexual-battery convictions are against the manifest weight of the

evidence, then will review whether Bentz's kidnapping conviction is based on sufficient evidence or against the manifest weight of the evidence.[3]

{¶90} In his manifest-weight-of-the-evidence argument, Bentz argues that application of the facts in this case to the factors identified by the Supreme Court of Ohio in *State v. Apanovitch* indicate that the trier of fact clearly lost its way in convicting Bentz of rape and sexual battery. 33 Ohio St.3d 19, 23-24 (1987). Those factors "include [1] whether the evidence was uncontradicted, [2] whether a witness was impeached, [3] what was not proved, [4] that the reviewing court is not required to accept the incredible as true, [5] the certainty of the evidence, [6] the reliability of the evidence, [7] whether a witness' testimony is self-serving, and [8] whether the evidence is vague, uncertain, conflicting, or fragmentary." *Id.*

{¶91} In particular, Bentz argues that the first and second factors—whether the evidence is uncontradicted and whether a witness was impeached—undermine his convictions based on K.A.'s and Kelli's contradictory and impeaching testimony. He contends that K.A.'s and Kelli's testimony regarding the trip to the police station is undermined by Kelli's testimony that she disconnected the phone "on the 911 operator just minutes earlier" because K.A. "was denying it and [Kelli] had no proof" and "there was no mention of [K.A.] being raped until Kelli was pulled over for speeding." (Appellant's Brief at 22). He further contends that

---

[3] Bentz does not assert his sexual-battery conviction under R.C. 2907.03(A)(13) is against the manifest weight of the evidence or based on insufficient evidence.

"K.A.'s testimony contradicted herself, and it contradicted Kelli's" as it related to those events. (*Id.* at 23). Also, he argues that K.A.'s testimony that she could not "recall Kelli calling her a 'slut'" was contradicted by Irwin's and Bentz's testimony that Kelli called her that and Kelli's "refus[al] to deny it." (*Id.* at 25). Bentz argues that K.A.'s testimony was likewise contradicted by Irwin's testimony that "when he came across [K.A.] hiding in the closet, she had a look on her face like she had just been caught." (*Id.*).

{¶92} Second, Bentz argues that the fourth factor—that the reviewing court is not required to accept the incredible as true—demonstrates that the trial court clearly lost its way in convicting him because the evidence related to K.A.'s intoxication is so incredible that we should not accept it as true in our manifest-weight review. Bentz contends that K.A.'s "strange intoxication" undermines the State's theory that "she could not physically resist [Bentz's] sexual advances and his threat of force." (*Id.* at 20). More specifically, Bentz argues that the time period in which the alcohol was allegedly consumed belies Bentz's rape and sexual-battery convictions—that is, Bentz argues that "the drinking likely started around 1:45 a.m. if [K.A.] is to be believed" and "[K.A.'s] drinking stopped before 3:00 a.m. at the latest when Mr. Irwin and Kelli Alger found her hiding in [Bentz's] closet," meaning that "[i]f [K.A.] consumed four to five shots from 1:45 a.m. to 2:45 a.m. ["[a]llowing 15 minutes' time for the sexual conduct"], then at 3:00 a.m. when she was

discovered in [Bentz's] closet, she would have been in the absorptive phase Dr. Forney testified about at trial" and "she would be getting more intoxicated though she stopped drinking.'" (*Id.* at 18-19). Based on that evidence, Bentz argues that K.A.'s intoxication is incredible because: (1) K.A.'s assertion that she drank four or five shots in a one-hour time period is contradicted by the fact that she "never threw up" and "[t]here was not even any testimony that [K.A.] was nauseous"; (2) K.A.'s "ability to walk" mysteriously ebbed and flowed where "after just two shots she found herself on the floor of the kitchen, unable to stand or walk" requiring Bentz "to carry her back to his room," yet she "was able to get to the kitchen just fine on her own" after being found in the closet, "did not have to be carried to Kelli Alger's car," and "did not need to be carried up the stairs to the Lima Police Department when she arrived there"; and (3) K.A. was not so intoxicated that she was "rendered incapable of resistance to other unwanted advances of a different sort, such as arguments from one's older sister that one is a 'slut' for having sexual relations with [Bentz]." (*Id.* at 18-21).

{¶93} Bentz also argues that K.A.'s and Kelli's self-serving testimony under the seventh factor demonstrates that the trier of fact lost its way in convicting Bentz. Namely, he argues that K.A.'s testimony was self-serving because blaming Bentz relieved her from being in trouble with her parents and Kelli. Bentz claims Kelli's

testimony was self-serving because she did not like Bentz and wanted Bentz to move out of the home she was sharing with Irwin.

{¶94} Finally, Bentz argues that the sixth and eighth factors—the reliability of the evidence and whether the evidence is vague, uncertain, conflicting, or fragmentary—demonstrate that his convictions are against the manifest weight of the evidence because (1) K.A. testified "that her memory of the evening was incomplete"; (2) K.A.'s assertions that "nothing happened" effectively caused Kelli to abandon "her attempts to reach 911"; (3) K.A. "used vague terms to describe what went on with [Bentz] while they were in his bedroom"; and (4) Norris "could not confirm or deny whether [K.A.'s] injuries * * * were consistent with rape." (*Id.* at 24-25).

{¶95} R.C. 2907.02 sets forth the offense of rape and provides, in relevant part: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). Bentz does not dispute that he engaged in sexual conduct with K.A.; rather, he argues that the trial court's conclusion that he purposely compelled K.A. to engage in that sexual conduct by force or threat of force is against the manifest weight of the evidence. As such, we need only address those elements of forcible rape: (1) whether Bentz purposely compelled K.A. to engage in sexual conduct, and

(2) whether Bentz did so by force or threat of force. *See State v. Stevens*, 3d Dist. Allen No. 1-14-58, 2016-Ohio-446, ¶ 14.

> A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.

R.C. 2901.22(A).

**{¶96}** In addressing the force-or-threat-of-force language under the rape statute, the Supreme Court of Ohio clarified that "[a] defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." *State v. Schaim*, 65 Ohio St.3d 51 (1992), paragraph one of the syllabus. "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). A victim "need not prove physical resistance to the offender" in order to demonstrate force. R.C. 2907.05(D).

**{¶97}** "'[T]he amount of force [necessary to prove forcible rape under R.C. 2907.02(A)(2)] must be examined in light of the circumstances.'" *Stevens* at ¶ 21, quoting *State v. Runyons*, 3d Dist. Union No. 14-91-30, 1992 WL 136196, *2 (June

9, 1992). "The Supreme Court of Ohio 'case law demonstrates that the type and amount of force necessary to purposefully compel a victim to submit by "force or threat of force" depends upon the victim and the offender's relationship.'" *Id.*, quoting *State v. Wine*, 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837, ¶ 41, citing *State v. Pordash*, 9th Dist. Lorain No. 04CA008480, 2004-Ohio-6081, ¶ 12. The amount of force necessary "'depends upon the age, size and strength of the parties and their relation to each other.'" *In re Forbess*, 3d Dist. Auglaize No. 2-09-20, 2010-Ohio-2826, ¶ 40, quoting *State v. Eskridge*, 38 Ohio St.3d 56 (1988), paragraph one of the syllabus. "When the victim is a child over whom the defendant is in a position of authority, the Ohio Supreme Court held in *State v. Eskridge*, the "'[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.'"" *State v. Jordan*, 2d Dist. Montgomery No. 26163, 2016-Ohio-603, ¶ 17, quoting *Eskridge* at 58-59, quoting *State v. Fowler*, 27 Ohio App.3d 149, 154 (8th Dist.1985). *See also State v. Dye*, 82 Ohio St.3d 323 (1988), syllabus.

{¶98} Notwithstanding Bentz's arguments, based on the specific facts and circumstances of this case, we conclude that the trial court's conclusion that Bentz purposefully compelled K.A. to submit to sexual conduct by force or threat of force is not against the manifest weight of the evidence. Ultimately, this case turned on

whether the trial court believed K.A.'s or Bentz's version of events. "Although we consider the credibility of witnesses in a manifest weight challenge, we are mindful that the determination regarding witness credibility rests primarily with the trier of fact because the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections—observations that are critical to determining a witness's credibility." *State v. Williams*, 8th Dist. Cuyahoga No. 98210, 2013-Ohio-573, ¶ 31, citing *State v. Clark*, 8th Dist. Cuyahoga No. 94050, 2010-Ohio-4354, ¶ 17, citing *State v. Hill*, 75 Ohio St.3d 195, 205 (1996) and *State v. Antill*, 176 Ohio St. 61, 66 (1964). The trier of fact was free to accept or reject any or all of K.A.'s testimony, and decided to accept her testimony that she did not consent to sexual conduct with Bentz. *See id.*, citing *State v. Smith*, 8th Dist. Cuyahoga No. 93593, 2010-Ohio-4006, ¶ 16. *See also In re Forbess* at ¶ 42 (concluding that it was not unreasonable for the trial court to believe the victim's testimony over the defendant's protest that the sexual encounter was consensual).

{¶99} Under the reduced-force standard of *Eskridge*, the evidence supporting that K.A.'s will was overcome by fear or duress is weightier than the evidence that she consented to the sexual conduct. The *Apanovitch* factors Bentz contends demonstrate that his rape conviction is against the manifest weight of the evidence do not undermine the evidence in the record documenting K.A.'s fear of Bentz. That is, K.A. is a child-victim over whom Bentz was in a position of authority based on

his employment as a police officer. Indeed, K.A. testified that she knew Bentz was a police officer and, as such, owned firearms. She testified that she was afraid of Bentz based on a previous encounter with him in which he told her not to lock the door because he hoped someone would break into the house so that he could shoot them. K.A. expressed that she was fearful that Bentz would shoot her—or Kelli or Irwin—if she resisted Bentz. Accordingly, we cannot say that the trier of fact lost its way in concluding that K.A.'s will was overcome by fear, establishing the element of force. *Compare Pordash* at ¶ 12 (concluding that the trier of fact did not lose its way in concluding that the victims' wills were overcome by fear based on the victims' knowledge that their chiropractor had an extensive background in martial arts and their testimony that "they feared that any resistance would lead to serious bodily harm"). *See also State v. Dew*, 7th Dist. Mahoning No. 08 MA 62, 2009-Ohio-6537, ¶ 134; *State v. Arias*, 9th Dist. Lorain No. 04CA008428, 2004-Ohio-4443, ¶ 32-33.

{¶100} Moreover, there is some evidence of actual force in this case. Although K.A. testified that she told Bentz "no" in Bentz's bedroom, K.A. testified that she was mindful of her fear of Bentz as he picked her up and carried her to his bedroom. *See State v. Rodriguez*, 8th Dist. Cuyahoga No. 82265, 2003-Ohio-7056, ¶ 28, 35-36 (suggesting that forcible rape can be proven by showing that a defendant

picked up and carried a victim).  *See also State v. Rupp*, 7th Dist. Mahoning No. 05 MA 166, 2007-Ohio-1561, ¶ 53.

**{¶101}** We further conclude that the trier of fact did not lose its way in concluding that Bentz purposefully compelled K.A. to engage in sexual conduct. Indeed, Bentz took "certain objective actions" to instill fear, and K.A. "was in fact instilled with such fear that she could not exercise her will"—that is, Bentz made it known to K.A. that he was a police officer and that he had hoped to shoot someone. *See Rupp* at ¶ 40-41, 52, citing *Arias* at ¶ 32.  Therefore, we conclude that Bentz's rape conviction under R.C. 2907.02(A)(2) is not against the manifest weight of the evidence.

**{¶102}** Next, we address whether Bentz's sexual-battery conviction under R.C. 2907.03(A)(2) is against the manifest weight of the evidence.  The offense of sexual battery under R.C. 2907.03 provides, in relevant part:  "No person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired."  R.C. 2907.03(A)(2).  Since Bentz concedes that he engaged in sexual conduct with K.A., we need only address whether the trial court's conclusion that K.A. was substantially impaired and that Bentz knew or had cause to reasonably believe that

K.A. was substantially impaired is against the manifest weight of the evidence. *See State v. Rivera*, 8th Dist. Cuyahoga No. 97091, 2012-Ohio-2060, ¶ 20.

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B).

**{¶103}** "Because 'substantial impairment' is not defined in the Ohio Criminal Code, the Supreme Court of Ohio has found that 'substantial impairment' can be established 'by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct.'" *In re T.N.*, 3d Dist. Marion No. 9-15-36, 2016-Ohio-5774, ¶ 56, quoting *State v. Zeh*, 31 Ohio St.3d 99, 103-104 (1987), and citing *State v. Brown*, 3d Dist. Marion No. 9-09-15, 2009-Ohio-5428, ¶ 21. Although sexual battery under R.C. 2907.03(A)(2) does not include the same language that the substantially-impaired-

rape and gross-sexual-imposition statutes contain—that the victim be substantially impaired *because of a mental or physical condition*—other courts have applied the line of case law describing voluntary intoxication as a substantial impairment to the substantially-impaired-sexual-battery statute. *See State v. Jenkins*, 2d Dist. Greene No. 2015-CA-6, 2015-Ohio-5167, ¶ 22; *Rivera* at ¶ 22; *State v. Messer*, 2d Dist. Montgomery No. 23779, 2011-Ohio-129, ¶ 16-18; *State v. Doss*, 8th Dist. Cuyahoga No. 884433, 2008-Ohio-449, ¶ 13-18.

{¶104} "The consumption of large amounts of alcohol in a short period of time is evidence that voluntary intoxication caused substantial impairment." *In re T.N.* at ¶ 57, citing *State v. Lasenby*, 3d Dist. Allen No. 1-13-36, 2014-Ohio-1878, ¶ 28, citing *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, ¶ 22 (2d Dist.) and *State v. Lindsay*, 3d Dist. Logan No. 8-06-24, 2007-Ohio-4490, ¶ 20. "Evidence of substantial impairment can also come from a victim's inability to remember the events of the incident due to alcohol consumption." *Lasenby* at ¶ 28, citing *State v. Harmath*, 3d Dist. Seneca No. 13-06-20, 2007-Ohio-2993, ¶ 19. "'[S]tumbling, falling, slurred speech, passing out, [and] vomiting,' are all evidence that an intoxicated person is substantially impaired." *Id.*, quoting *Hatten* at ¶ 24, and citing *State v. Freeman*, 8th Dist. Cuyahoga No. 95511, 2011-Ohio-2663, ¶ 19 and *Harmath* at ¶ 18.

However, "there can be a fine, fuzzy, and subjective line between intoxication and [substantial] impairment. Every alcohol consumption does not lead to a substantial impairment. Additionally, the waters become even murkier when reviewing whether the defendant knew, or should have known, that someone was [substantially] impaired rather than merely intoxicated."

*In re T.N.* at ¶ 57, quoting *Doss* at ¶ 18.

{¶105} Bentz maintains that, while the evidence may show that K.A. was intoxicated, the evidence in the record weighs against the conclusion that K.A. was substantially impaired and that Bentz knew, or had cause to reasonably believe, that K.A. was substantially impaired. The crux of Bentz's argument is predicated on the timeline of K.A.'s intoxication. In particular, he argues that, if it is to be believed that K.A. was substantially impaired, the evidence in the record should reflect that she became *more* impaired as the events of that night unfolded. Instead, he argues that the weight of the evidence illustrates that she was not substantially impaired because she was able to ambulate out of Bentz's bedroom, to Kelli's vehicle, and to the police department without assistance. In addition, he argues that K.A. was able to ward off the advances of her angry sister after being discovered in the closet by arguing with Kelli that "nothing happened." Likewise absent from the record, according to Bentz, is evidence that K.A. vomited or was nauseous. Bentz also

points to (1) Norris's, Irwin's, and Lieutenant Bishop's testimony that they did not smell any odor of alcohol coming from K.A, (2) Lieutenant Bishop's testimony that he did not think K.A. was intoxicated, and (3) that K.A. does not appear to be intoxicated, let alone substantially impaired, in the video recording of her interview with Lieutenant Bishop. (*See* State's Ex. 35).

{¶106} However, the evidence in the record that K.A.'s voluntary intoxication caused her to be substantially impaired and that Bentz knew, or had cause to reasonably believe, that K.A. was substantially impaired is weightier than the evidence that Bentz says indicates that she was not substantially impaired or that he did not know, or have cause to reasonably believe, that she was substantially impaired. Bentz was aware that K.A. consumed a large amount of alcohol in a short period of time—namely, four or five shots of tequila in approximately one hour. *See Jenkins*, 2015-Ohio-5167, at ¶ 30. Although there is evidence in the record that K.A. has consumed alcohol in the past, Bentz was able to observe that K.A. is a small person—weighing under 100 pounds—and has a very youthful appearance— facts indicative that the consumption of four or five shots of liquor in a relatively short period of time would have a significant impact toward rendering K.A. substantially impaired. Notwithstanding Bentz's assertion that K.A. did not appear to be impaired by the shots of alcohol, the record reflects Bentz's awareness of the consequences that four or five shots of alcohol would have on K.A. because he

indicated that he told K.A. that she "'probably [does not] need to be taking another shot'" when she asked for an additional shot. (Feb. 16-17, 2016 Tr., Vol. II, at 459). Moreover, K.A. testified that she was unable to stand or ambulate after the second shot of tequila, requiring her to lay down on the floor, and requiring Bentz to assist her up. K.A. also testified that she had difficulty remembering details of the events of June 11, 2015 because she "wasn't like fully there" and was "in and out" from the alcohol that she consumed. (Feb. 16-17, 2016 Tr., Vol. I, at 217).

{¶107} Likewise, Kelli indicated that K.A. appeared "to be drunk" when she emerged from Bentz's closet because she was stumbling. (Feb. 16-17, 2016 Tr., Vol. II, at 408). The video of Patrolman Carpenter's traffic stop of Kelli and K.A. depicts K.A. having trouble maintaining her balance while attempting to ambulate. (*See* State's Ex. 34). That K.A. was substantially impaired is supported by Dr. Forney's retrograde extrapolation, which concluded that K.A.'s "alcohol concentration" at the time the sexual conduct occurred would have been between 0.12 and 0.19 grams by weight of alcohol per 100 millimeters of whole blood. According to Dr. Forney, K.A. "would have been significantly intoxicated" and "would have been obtunded and would not have been able to affectively resist the assault or defend herself." (Feb. 16-17, 2016 Tr., Vol. II, at 297).

{¶108} Based on that evidence, we cannot conclude that the trial court lost its way in concluding that K.A. was substantially impaired or that Bentz knew, or

had cause to reasonably believe, that K.A. was substantially impaired. As such, Bentz's sexual battery conviction under R.C. 2907.03(A)(2) is not against the manifest weight of the evidence.

{¶109} Before addressing whether Bentz's kidnapping conviction is against the manifest weight of the evidence, we will address whether Bentz's kidnapping conviction is based on sufficient evidence. Bentz argues that there is insufficient evidence that he committed kidnapping because there is insufficient evidence (1) "to satisfy the force or threat of force element of the kidnapping charge" and (2) "that [Bentz] did what he did to facilitate commission of any felony or flight thereafter." (Appellant's Brief at 12, 14).

{¶110} The offense of kidnapping is codified under R.C. 2905.01, which provides, in relevant part:

(A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(2) To facilitate the commission of any felony or flight thereafter.

R.C. 2905.01(A)(2). Under R.C. 2905.01(A), "'the mens rea of the statute is purpose,'" which we defined above. *State v. Montgomery*, 2d Dist. Montgomery

No. 22193, 2009-Ohio-1415, ¶ 12, quoting *State v. Carver*, 2d Dist. Montgomery No. 21328, 2008-Ohio-4631, ¶ 145.

{¶111} Because they are the only elements Bentz challenges on appeal, we will address only whether the evidence, when viewed in a light most favorable to the prosecution, is such that a rational trier of fact could have found that: (1) Bentz purposefully removed K.A. from the place where she was found or restrained K.A.'s liberty *by force, threat, or deception*; and (2) Bentz's purpose was to facilitate the rape or sexual battery or his *flight* after committing the rape or sexual battery. *See State v. Totarella*, 11th Dist. Lake No. 2002-L-147, 2004-Ohio-1175, ¶ 56.

{¶112} As an initial matter, we note that there is no "threat of force" element of kidnapping under R.C. 2905.01(A)(2); rather, the statute requires proof that a defendant *forced*, *threatened*, or *deceived* a victim. The State argues that Bentz's kidnapping conviction is based on sufficient evidence because the reduced-force standard of *Eskridge* applies, which satisfies the element of force. *See State v. Weems*, 8th Dist. Cuyahoga No. 102954, 2016-Ohio-701, ¶ 24-25 (applying the reduced-force standard to the kidnapping statute). However, we need not, and do not, express an opinion as to whether the reduced-force standard applicable under the rape statute similarly applies to the kidnapping statute. Rather, we conclude that there is insufficient evidence supporting the element of flight.

{¶113} "To convict a defendant of kidnapping in violation of R.C. 2905.01(A)(2), the kidnapping must *either* be done to facilitate the felony or to facilitate the flight after the felony." (Emphasis added.) *State v. Seitz*, 3d Dist. Shelby No. 17-12-11, 2014-Ohio-2463, ¶ 26. Under the State's theory of the case, based on the amended bill of particulars and the State's closing argument, the kidnapping was not done to facilitate the felony—the rape or sexual battery. (*See* Doc. No. 119); (Feb. 16-17, 2016 Tr., Vol. II at 523-525). (*See also* Apr. 14, 2016 Tr. at 21-23); (Doc. No. 225); (Appellee's Brief at 4-6).[4] Instead, the kidnapping charge stemmed from Bentz's direction to K.A. to get into the closet *after* the rape and sexual battery was committed.

{¶114} The element of flight under R.C. 2905.01(A)(2) has not been addressed in any depth. *Compare State v. Agee*, 350 S.W.3d 83, 89 (Mo.App.2011) (looking to the definition of "flight" in *Black's Law Dictionary* to apply to the element of flight under the kidnapping statute because "flight" is not defined in the criminal statute); *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243, ¶ 34 (noting that "the term 'flight,' * * * within the meaning of the aggravated kidnaping statute" had not been defined by the Supreme Court of Utah and looking to "[i]ts use in the

---

[4] In its merger argument, the State reiterated that the kidnapping charge stemmed from Bentz's conduct after "[t]he rape was committed and completed"—that is, "[i]t was after the completion of the crime of rape that the crime of kidnapping began, during which time [Bentz] ordered [K.A.] into the closet." (Apr. 14, 2016 Tr. at 22). (*See also* Doc. No. 225). Indeed, the State asserted that Bentz "was charged, the bill of particulars spells out, and he was convicted for kidnapping as it relates to facilitating flight after a felony." (Apr. 14, 2016 Tr. at 21). Likewise, the State reiterated the same theory of the case in its Appellee's Brief. (*See* Appellee's Brief at 4-6).

criminal law" and *Black's Law Dictionary* for guidance). As such, looking to the definition of "flight" in *Black's Law Dictionary* as well as the definition of "flight" applied in the jury-instruction arena are informative on the issue.

**{¶115}** *Black's Law Dictionary* defines "flight" as "[t]he act or an instance of fleeing, esp. to evade arrest or prosecution." *Black's Law Dictionary* 756 (10th Ed.2014). Similarly, in the jury-instruction arena, "[f]light means some escape or affirmative attempt to avoid apprehension." *State v. Robinson*, 1st Dist. Hamilton No. C-060434, 2007-Ohio-2388, ¶ 19, citing *State v. Brundage*, 1st Dist. Hamilton No. C030632, 2004-Ohio-6436, ¶ 17. The purpose of a flight instruction is to show that a defendant had a conscious awareness of his guilt because the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt. *See State v. Taylor*, 78 Ohio St.3d 15, 27 (1997). *See also State v. Wilson*, 3d Dist. Allen No. 1-09-64, 2010-Ohio-2294, ¶ 9. "[T]he '"mere departure from the scene of the crime is not to be confused with deliberate flight from the area in which the suspect is normally to be found."'" *State v. Shepherd*, 8th Dist. Cuyahoga No. 102951, 2016-Ohio-931, ¶ 23, quoting *State v. Santiago*, 8th Dist. Cuyahoga No. 95516, 2011-Ohio-3058, ¶ 30, quoting *State v. Norwood*, 11th Dist. Lake Nos. 96-L-089 and 96-L-090, 1997 WL 663423, *5 (Sept. 30, 1997). To be considered a flight, "it must be clear that the defendant took affirmative steps to avoid detection and apprehension beyond simply not remaining

at the scene of the crime." *Id.*, citing *State v. Dunn*, 8th Dist. Cuyahoga No. 101648, 2015-Ohio-3138, ¶ 52.

{¶116} There is no evidence in this case supporting that Bentz made any attempt to avoid apprehension, or that Bentz left the scene of the crime. *See Finlayson* at ¶ 35 (concluding that Finlayson's kidnapping conviction was based on insufficient evidence because there was no evidence of flight since he "returned to his apartment where he was eventually arrested" and "[t]here is no evidence that he made any attempt to withdraw, conceal himself, or avoid arrest"). *See also Norwood* at *5-6 (concluding that the facts were "insufficient to justify a flight instruction because [Norwood] did not flee to a situs where he could not have been easily located" even though Norwood (1) "'left out of the building and ran into another building'" (2) "attempt[ed] to hide in [a] kitchen" when law enforcement arrived; and (3) went to his father's house instead of his mother's house where he normally stayed). Indeed, Bentz's actions do not exhibit a consciousness of guilt. When Bentz exited the bedroom to the kitchen, he left the bedroom door open. After the confrontation with Kelli and K.A. when K.A. was discovered in Bentz's closet, Bentz remained at the house. Bentz continued to remain at the house even after Irwin learned that K.A. accused Bentz of rape to law enforcement and communicated that to Bentz. Rather, the record reflects that Bentz waited at the residence for law enforcement to arrest him and even went to the police department

that day to report for work. Stated another way, there is no evidence in the record that Bentz was attempting to flee to avoid apprehension. For these reasons, we conclude that reasonable minds could not conclude that "flight" was proven beyond a reasonable doubt. Therefore, we hold that there is insufficient evidence to support a conviction for kidnapping under R.C. 2905.01(A)(2). Because we conclude that Bentz's kidnapping conviction under R.C. 2905.01(A)(2) is based on insufficient evidence, we need not address his argument that his kidnapping conviction is against the manifest weight of the evidence.

{¶117} For these reasons, Bentz's third assignment of error is sustained and his fourth assignment of error is overruled.

### Assignment of Error No. I

**The Trial Court Erred when it Convicted the Defendant for Violating Ohio Revised Code Section 2907.03(A)(13). [R.221 and 25 . [sic] Transcript of Verdict Hearing Pages 5-6 Lines 12-03]**

{¶118} In his first assignment of error, Bentz argues that the trial court erred in finding him guilty of sexual battery in violation of R.C. 2907.03(A)(13) because that statute is unconstitutional. The State concedes this error. We agree.

{¶119} The Supreme Court of Ohio concluded that R.C. 2907.03(A)(13) is unconstitutional. *State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, ¶ 70. Bentz properly preserved his constitutional argument on appeal. *See State v. Rowles*, 9th Dist. Summit No. 24154, 2008-Ohio-6631, ¶ 5. *See also State v. Awan*, 22 Ohio

St.3d 120 (1986), syllabus. Accordingly, we reverse Bentz's finding of guilt as to sexual battery in violation of R.C. 2907.03(A)(13), and order that he be discharged from that offense. *See State v. Cobia*, 1st Dist. Hamilton No. C-140058, 2015-Ohio-331, ¶ 11 ("We discharge Mr. Cobia on his child-enticement convictions, because the child-enticement statute, R.C. 2905.05(A), is unconstitutional."); *State v. Cunningham*, 178 Ohio App.3d 558, 2008-Ohio-5164, ¶ 9 (2d Dist.); *State v. Holycross*, 8th Dist. Cuyahoga Nos. 41210, 41211, and 41217, 1980 WL 354919, *2 (July 10, 1980); *State v. Bunch*, 10th Dist. Franklin No. 79AP-645, 1980 WL 353551, *1 (June 26, 1980). *See also State v. Stayer*, 3d Dist. Defiance No. 4-06-01, 2006-Ohio-2780, ¶ 8.

**{¶120}** Bentz's first assignment of error is sustained.

### Assignment of Error No. II

**The Trial Court Erred when it Considered Irrelevant Evidence in Determining the Credibility of the Defendant. [R. R.221 [sic] and 250 Transcript of Verdict Hearing Pages 4-5 Lines 1-09]**

**{¶121}** In his second assignment of error, Bentz argues that the trial court erred by considering irrelevant evidence when determining Bentz's credibility. Bentz essentially raises two arguments under his second assignment of error: (1) that the trial court erroneously admitted irrelevant and unfairly prejudicial evidence at the time of trial and (2) that admission of that evidence became erroneous after

trial based on the Supreme Court of Ohio's decision in *Mole*. 149 Ohio St.3d 215, 2016-Ohio-5124.

**{¶122}** We will first address Bentz's argument that the trial court abused its discretion by admitting irrelevant and unfairly prejudicial evidence at the time of trial, followed by Bentz's argument that the evidence became retroactively irrelevant tainting the fairness of his trial.

**{¶123}** "In a criminal case in which a defendant-appellant alleges that it was reversible error to allow the trier of fact to hear certain testimony, the reviewing court must first determine if it was error to allow the trier of fact to hear the testimony and, if so, whether such error was prejudicial or harmless." *State v. Walker*, 8th Dist. Cuyahoga No. 87968, 2007-Ohio-3772, ¶ 19, citing *State v. Benton*, 8th Dist. Cuyahoga No. 82810, 2004-Ohio-3116, ¶ 42, citing *State v. Davis,* 44 Ohio App.2d 335 (8th Dist.1975), paragraph three of the syllabus. *See State v. Randolph*, 3d Dist. Seneca No. 13-81-31, 1983 WL 7256, *2 (May 11, 1983), quoting *Davis* at paragraph three of the syllabus. *See also State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, syllabus; R.C. 2953.83(C).

> All relevant evidence is admissible, except as otherwise provided by
> the Constitution of the United States, by the Constitution of the State
> of Ohio, by statute enacted by the General Assembly not in conflict
> with a rule of the Supreme Court of Ohio, by these rules, or by other

rules prescribed by the Supreme Court of Ohio. Evidence which is

not relevant is not admissible.

Evid. R. 402. Evidence is relevant when it has "any tendency to make the existence

of any fact that is of consequence to the determination of the action more probable

or less probable than it would be without the evidence." Evid.R. 401. "Under

Evid.R. 403(A), '[a]lthough relevant, evidence is not admissible if its probative

value is substantially outweighed by the danger of unfair prejudice, of confusion of

the issues, or of misleading the jury.'" *State v. Velez*, 3d Dist. Putnam No. 12-13-

10, 2014-Ohio-1788, ¶ 122, quoting *State v. Maag*, 3d Dist. Hancock Nos. 5-03-32

and 5-03-33, 2005-Ohio-3761, ¶ 71.

**{¶124}** "Evid.R. 403(A) does not 'attempt to bar all prejudicial evidence.'"

*State v. Scurlock*, 6th Dist. Lucas No. L-5-1200, 2017-Ohio-1219, ¶ 32, quoting

*State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 23. "Instead, the rule

provides that only *unfairly* prejudicial evidence is excludable." (Emphasis sic.) *Id.*,

citing *Crotts* at ¶ 23.

> "'Unfair prejudice is that quality of evidence which might result in an
>
> improper basis for a jury decision. Consequently, if the evidence
>
> arouses the jury's emotional sympathies, evokes a sense of horror, or
>
> appeals to an instinct to punish, the evidence may be unfairly

prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.'"

*Crotts* at ¶ 24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 171 (2001), quoting Weissenberger, *Ohio Evidence*, Section 403.3, at 85-87 (2000). *See also Velez* at ¶ 122, quoting *State v. Calhoun*, 11th Dist. Ashtabula No. 2010-A-0057, 2012-Ohio-1128, ¶ 82.

{¶125} Generally, the admission or exclusion of evidence lies within the trial court's discretion, and a reviewing court should not reverse absent an abuse of discretion and material prejudice. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). An abuse of discretion implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). However, "if the party wishing to exclude evidence fails to contemporaneously object at trial when the evidence is presented, that party waives for appeal all but plain error." *State v. Bagley*, 3d Dist. Allen No. 1-13-31, 2014-Ohio-1787, ¶ 53-54, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 59-60, *State v. Barrett*, 4th Dist. Scioto No. 03CA2889, 2004-Ohio-2064, ¶ 20, and *State v. Lenoir*, 2d Dist. Montgomery No. 22239, 2008-Ohio-1984, ¶ 19.

{¶126} "Crim.R. 52(B) governs plain-error review in criminal cases." *Id.* at ¶ 55, citing *State v. Risner*, 73 Ohio App.3d 19, 24 (3d Dist.1991). "A court

recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice." *State v. Smith*, 3d Dist. Hardin No. 6-14-14, 2015-Ohio-2977, ¶ 63, citing *State v. Saleh*, 10th Dist. Franklin No. 07AP-431, 2009-Ohio-1542, ¶ 68. Under plain-error review, "[w]e may reverse only when the record is clear that defendant would not have been convicted in the absence of the improper conduct." *Id.*, citing *State v. Williams*, 79 Ohio St.3d 1, 12 (1997).

**{¶127}** As an initial matter, we must address whether Bentz properly preserved this issue on appeal. Although, Bentz contemporaneously objected to the testimony he is challenging on appeal, his objection was on a different basis than the grounds he raises on appeal—namely, Bentz's stated reason for his objection was that the State's cross-examination of Bentz was "argumentative." (Feb. 16-17, 2016 Tr., Vol. II, at 479, 481). "'Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and' '[i]n case the ruling is one admitting evidence, a timely objection appears in the record stating the specific ground of the objection, if the specific ground was not apparent from the context.'" *Stark v. Stark*, 5th Dist. Delaware No. 01CAF6020, 2002 WL 109281, *3 (Jan. 4, 2002), quoting Evid.R. 103(A)(1). Notwithstanding the prescription of Evid.R. 103(A)(1) requiring a timely objection stating the specific ground of the objection, even if we assume without deciding that an abuse-of-discretion standard applies to the evidence Bentz is challenging on appeal, the

result is still the same. *See State v. Wendel*, 3d Dist. Union No. 14-16-08, 2016-Ohio-7915, ¶ 10 ("We will assume without deciding that an abuse-of-discretion standard of review applies as to Rebecca's testimony, even though Wendel objected to only one of the statements."); *Stark* at \*3 ("Although appellant did not specifically state hearsay as the reason for the objection, the court did not abuse its discretion in admitting the evidence.").

{¶128} Under his contemporaneous-to-trial argument, Bentz argues that, because sexual battery under R.C. 2907.03(A)(13) essentially imposed strict liability for peace officers who engaged in sexual conduct with a minor, the evidence regarding whether Bentz appreciated K.A.'s age is irrelevant. That is, he argues that once the State proved K.A.'s age, it was irrelevant to introduce evidence regarding whether Bentz knew or should have known her age. *See Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, at ¶ 8. In support of his argument, Bentz points to the Supreme Court of Ohio's discussion regarding the age of consent in Ohio, which is "16 years under Ohio statutory law." *Id.* at ¶ 31. Drawing from that discussion, Bentz argues that, based on the Supreme Court of Ohio's conclusion in *Mole* that the sexual-battery statute under R.C. 2907.03(A)(13) "does not require the state to prove that [a defendant] knew [the victim] was a minor or that [the defendant] was reckless in not knowing [the victim] was a minor," Bentz's testimony "that he thought [K.A.] was an adult, which the Trial Judge found so incredible" was

irrelevant and unfairly prejudicial at the time it was admitted. (Appellant's Brief at 11); *Mole* at ¶ 58.

**{¶129}** While the testimony that Bentz challenges on appeal may have been irrelevant to prove that he committed sexual battery under R.C. 2907.03(A)(13), that testimony was relevant to whether Bentz committed the other crimes for which he was on trial. *See State v. Lanci*, 8th Dist. Cuyahoga Nos. 39907 and 39906, 1980 WL 354390, *7 (Sept. 25, 1980) ("Further, the dismissed count of engaging in organized crime was related to the remaining two counts submitted to the jury, and much, if not all, of the evidence, admitted as probative of the organized crime count, was also probative of the aggravated arson and aggravated murder counts."); *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, ¶ 170 (concluding that "[a] defendant's gang affiliation is relevant and admissible" because it "strengthens [a defendant's] motive to commit" the underlying crime). *See also People v. McLaughlin*, 258 Mich.App. 635, 666-667 (2003) (concluding that "evidence of defendant's financial, housing, and employment situation were relevant to the prosecution's theory of the case" in a rape trial because that evidence was used "to explain the change in the relationship between defendant and the victim from a romantic liaison to a violent assault"); *Cleveland v. Petko*, 112 Ohio App.3d 670, 676 (8th Dist.1996) (concluding that, because it was a bench trial, photographs of a fence were not irrelevant to proving whether Petko committed aggravated menacing

since the aggravating-menacing charge stemmed from a dispute regarding the fence); *State v. Loso*, 151 Vt. 262, 264, 559 A.2d 681 (1989) (concluding that evidence that the defendant was employed as a police officer "was slightly relevant on the issue of motive" for leaving the scene of an accident because the State's theory was that "a police officer would be more likely than others to flee the scene of an accident for fear of losing his job"). That is, part of the State's theory of the case is that Bentz relied on his position of authority as police officer to commit those crimes against a child-victim, who is susceptible to that influence. Stated differently, as we discussed in Bentz's fourth assignment of error, the State's theory of the case regarding the rape charge implicated the reduced-force standard of *Eskridge*, and Bentz's appreciation of K.A.'s age related to the State's theory of the case regarding the sexual battery charge under R.C. 2907.03(A)(2)— whether Bentz knew, or had cause to reasonably believe, K.A. was substantially impaired. As such, we conclude that the evidence challenged by Bentz is relevant.

{¶130} Nonetheless, Bentz argues that, even if that evidence is relevant, its probative value is substantially outweighed by the danger of unfair prejudice and it should have been excluded. Bentz points to the trial court's statement as proof that the evidence regarding his appreciation of K.A.'s age unfairly prejudiced the fairness of his trial:

[T]he court believes that it is important to resort to issues of credibility. Credibility, of course, of the witnesses, and particularly the credibility of the defendant, was [sic] well as [K.A.].

* * *

On the other hand, Mr. Bentz's testimony is not credible. Mr. Bentz is a police officer and was at the time or was at the time. His testimony is particularly telling as it relates to indicating he did not know that she was a minor and indicated further that it never occurred to him that she was a minor.

He was fully aware that [K.A.] was Kelli's younger sister, having lived at the residence, for a month at the same time Kelli had lived at the residence. Kelli appears young. And this, of course, from all facts and circumstances as it relates from the evidence that this young lady, [K.A.] was younger.

It is one thing for somebody who's in a position of not making judgments with respect to age to come to some conclusions that could reasonably be accepted. But as a police officer Mr. Bentz had every reason to believe that this child was extremely young. And to say that the thought of her age never crossed his mind, frankly borders on a destruction of credibility.

(Feb. 23, 2016 Tr. at 2-5).

**{¶131}** As we addressed in our sufficiency-and-manifest-weight-of-the-evidence analysis, this case presents the classic "he-said, she-said" scenario because the victim and the defendant provided very different accounts of the events of June 11, 2015. After weighing the credibility of the testimony, the trial court chose to believe K.A.'s testimony over Bentz's and found Bentz guilty of the crimes for which he was indicted. Clearly, the evidence related to K.A.'s age and Bentz's occupation was prejudicial. *Compare State v. Scurlock*, 2017-Ohio-1219, at ¶ 32 ("One cannot dispute that evidence of Scurlock's 'gambling habit' is prejudicial to his defense.").

**{¶132}** However, after thoroughly reviewing the record, although the evidence prejudiced Bentz, we cannot say that it *unfairly* prejudiced his trial because, as we discussed above, there is probative value in the evidence. *Compare Carter*, 2017-Ohio-123, at ¶ 91 ("Undoubtedly there is some inherent prejudice in evidence being used against Carter but there is probative value in the altercation as well."). *See also State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 107 ("Moreover, 'Evid.R. 403 speaks in terms of unfair prejudice. Logically, all evidence presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant. It is only the latter that Evid.R. 403 prohibits.'"), quoting *State v. Wright*, 48 Ohio St.3d 5, 8 (1990). Even in a jury trial, the standard under

Evid.R. 403 "is a difficult standard to meet, and broad discretion is vested in the trial judge." *State v. Bays*, 87 Ohio St.3d 15, 28 (1999). "But this was a bench trial, in which the [trial] court is presumed to have considered only the relevant, material, and competent evidence." *Id. See also State v. Wilson*, 5th Dist. Fairfield No. 09-CA-44, 2010-Ohio-1394, ¶ 19 (concluding that "the danger of unfair prejudice, of confusion of the issues, or of misleading the [t]rier of fact was minimal" since it was a bench trial). Indeed, the probative value of the evidence at issue here is not substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the trier of fact. *See State v. Tekip*, 5th Dist. Stark No. CA-8765, 1992 WL 89976, *1 (Apr. 20, 1992); *McLaughlin,* 258 Mich.App. at 667. Accordingly, we conclude that the trial court did not abuse its discretion by admitting Bentz's testimony regarding whether Bentz appreciated K.A.'s age.

**{¶133}** Next, we turn to Bentz's argument that the evidence became retroactively irrelevant and unfairly prejudicial in the aftermath of the Supreme Court of Ohio's decision in *Mole*. 149 Ohio St.3d 215, 2016-Ohio-5124. Here, we are tasked with reviewing the relevancy of evidence properly admitted at the time of trial—as we decided above—to determine whether that evidence became irrelevant and unfairly prejudicial after trial as the result of action by the Supreme Court of Ohio. To properly dispose of Bentz's argument, based on the unique

posture of this case, we liken the issue to a review of a motion for a new trial under Crim.R. 33.

{¶134} Crim.R. 33 provides a number of grounds under which a new trial may be granted. The standard of review applied to a motion for a new trial under Crim.R. 33 depends on the ground raised by a defendant. *See State v. Johnson*, 1st Dist. Hamilton No. C-990482, 2000 WL 1714213, *6 (Nov. 17, 2000) (noting that, depending on which ground is relied on, there are two standards of review applicable to review motions for a new trial under Crim.R. 33). *See also State v. Oldaker*, 4th Dist. Meigs No. 16CA3, 2017-Ohio-1201, ¶19, citing *State v. Campbell*, 4th Dist. Adams No. 13CA969, 2014-Ohio-3860, ¶ 10, citing *State v. Ogle*, 4th Dist. Hocking Nos. 11CA29, 11CA32, 12CA2, 12CA11, 12CA12, and 12CA19, 2013-Ohio-3420, ¶ 61-63, and *Johnson* at *6. "If the ruling on the motion requires the exercise of discretion, e.g., what was done or not done, said or not said, in the process of discovery, then a trial court will be reversed only upon a showing of abuse of that discretion." *Johnson* at *6. *See also Campbell* at ¶ 10, citing *Ogle* at ¶ 61-63 ("although the abuse-of-discretion standard of review is generally used in reviewing a trial court's ruling denying a motion for new trial, it is inapplicable when material, exculpatory evidence is withheld by the prosecution in a criminal proceeding"). "Where the resolution of the issues within a motion for a new trial

does not involve discretion, the trial court's decision must be shown to be erroneous as a matter of law." *Johnson* at \*6.

**{¶135}** Under his retroactive argument, Bentz argues that, because the Supreme Court of Ohio declared sexual battery in violation of R.C. 2907.03(A)(13) unconstitutional after trial, evidence related to the elements of that crime "was completely irrelevant in [sic] prejudicial" warranting him a new trial. (Appellant's Brief at 12). As such, the issue raised is akin to a violation of a defendant's due-process right to a fair trial—a purely legal issue. *See State v. Moore*, 3d Dist. Union No. 14-08-43, 2009-Ohio-2106, ¶ 19 ("We review de novo a trial court's resolution of a new trial motion based upon an alleged *Brady* violation, inquiring whether the defendant's due process rights were preserved."), citing *State v. Gibson*, 12th Dist. Butler No. CA2007-08-187, 2008-Ohio-5932, ¶ 24 and *State v. Carroll*, 6th Dist. Lucas No. L-05-1362, 2007-Ohio-5313, ¶ 57; *Ogle* at ¶ 61 (noting that the abuse-of-discretion standard of review is not applicable to reviewing a defendant's motion for a new trial, which asserted that his due process right to a fair trial under the Fourteenth Amendment was violated). That is, the issue raised by Bentz is an issue that is similar to an issue that if it were raised in a motion for a new trial, its resolution would not involve discretion. As such, we will review Bentz's retroactive argument de novo. *See Oldaker* at ¶ 21 (reviewing de novo the denial of Oldaker's motion for a new trial because it raised a question of law). *See also State v. Pausch*,

10th Dist. Franklin No. 98AP-1096, 1999 WL 35352, *1 (Jan. 28, 1999) (reviewing de novo legal errors intertwined with the appellate court's review of the denial of the defendant's motion for a new trial). De novo review involves an independent examination of the record. *See State v. Fetter*, 3d Dist. Auglaize No. 2-13-12, 2013-Ohio-4640, ¶ 20, citing *Twigg v. Trapp*, 3d Dist. Seneca No. 13-05-44, 2006-Ohio-3236, ¶ 5. *See also State v. Hudson*, 3d Dist. Marion No. 9-12-38, 2013-Ohio-647, ¶ 27, citing *Ohio Bell Tel. Co. v. Pub. Util. Comm. of Ohio*, 64 Ohio St.3d 145, 147 (1992).

{¶136} Although Bentz raises an interesting argument regarding the prejudicial nature of evidence related to a crime later deemed to be unconstitutional by the Supreme Court of Ohio, Bentz's argument necessarily fails based on the specific facts and circumstances of this case. That is, based on the specific facts and circumstances of this case, the Supreme Court of Ohio's decision in *Mole* does not automatically render evidence introduced at trial to prove the elements of R.C. 2907.03(A)(13) irrelevant and inadmissible warranting reversal of Bentz's convictions and a new trial ordered. *See* 149 Ohio St.3d 215, 2016-Ohio-5124, at ¶ 70. Based on our conclusion above, because that evidence was probative of whether Bentz was guilty of the other crimes for which he was on trial, we cannot say that the admission of evidence regarding Bentz's appreciation of K.A.'s age prevented

him from having a fair trial. *See Lanci*, 1980 WL 354390, at \*7. In other words, we cannot conclude that Bentz is entitled to a new trial.

{¶137} Bentz's second assignment of error is overruled.

**Assignment of Error No. V**

**The Trial Court Erred when it Convicted the Defendant of all charges except RC 4301.69(A) Despite the Ineffective Assistance of Counsel for the Defendant. [R. R.221 [sic] and 250 Transcript of Verdict Hearing Pages 5-8 Lines 10-05]**

{¶138} In his fifth assignment of error, Bentz argues that his trial counsel was ineffective. In particular, he contends his trial counsel was ineffective for failing to object to the State's asking leading questions of K.A. during direct examination.

{¶139} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673,

675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St. 3d 136, 141-42 (1989), quoting *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976), *vacated in part on other grounds*, 438 U.S. 910, 98 S.Ct. 3135 (1978).

**{¶140}** "Prejudice results when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Liles*, 3d Dist. Allen No. 1-13-04, 2014-Ohio-259, ¶ 48, quoting *Bradley* at 142, citing *Strickland* at 691. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Bradley* at 142 and citing *Strickland* at 694.

**{¶141}** As we explained in Bentz's second assignment of error, "this was a bench trial, and in a criminal case, a presumption exists that the trial court considers only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." *State v. Alghaben*, 8th Dist. Cuyahoga No. 86044, 2005-Ohio-6490, ¶ 29, citing *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, ¶ 25. The Supreme Court of Ohio "has held that 'it is within the trial court's discretion to allow leading questions on direct examination' and that trial counsel's failure to object does not constitute ineffective assistance of counsel."

*State v. Ocasio*, 9th Dist. Lorain No. 15CA010773, 2016-Ohio-4686, ¶ 37, quoting *State v. Jackson*, 92 Ohio St.3d 436, 449 (2001), and citing *State v. Kiley*, 9th Dist. Lorain No. 10CA009757, 2011-Ohio-1156, ¶ 4. Likewise, Evidence Rule 611(C), which "provides that '[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony,'" "does *not* prohibit the use of leading questions." (Emphasis added.) *State v. Stairhime*, 3d Dist. Defiance No. 4-13-06, 2014-Ohio-1791, ¶ 46; *Alghaben* at ¶ 29. "Finally, the Supreme Court of Ohio has recognized that declining to interrupt the prosecutor's argument with objections, or failing to object to certain evidence, is not deficient performance, especially in a bench trial." *Alghaben* at ¶ 29, citing *State v. Keene*, 81 Ohio St.3d 646, 668 (1998).

**{¶142}** "Clearly, some witnesses testify better than others; in other words, some will describe what happened with very little prompting by the prosecutor, while others will require a little more effort." *Alghaben* at ¶ 30. Similar to *Alghaben*, Bentz's defense counsel objected to the prosecutor's use of leading questions, and the trial court admonished the prosecutor to "watch [his] leading questions." (Feb. 16-17, 2016 Tr., Vol. I, at 215). *Compare Alghaben* at ¶ 30. Based on our review of the record, the leading questions of the prosecutor to which Bentz insists that his trial counsel should have objected "were mostly eliciting routine or undisputed facts." *State v. Howard*, 2d Dist. Montgomery No. 23588, 2010-Ohio-5158, ¶ 65.

As in *Howard*, "[t]o the extent that the questions reached into the area of disputed or controversial facts, the information was already before the court." *Id.* Similarly, the "leading nature" of many of the prosecutor's questions served to streamline the questioning or to clarify K.A.'s testimony, and Bentz's trial counsel acknowledged that when he objected to the prosecutor's leading questions. *Id.* (*See also* Feb. 16-17, 2016 Tr., Vol. I, at 215). Because "the trial court can distinguish between what a witness actually testifies to and what the state tries to get the witness to say even when defense counsel failed to object," we cannot conclude that Bentz was prejudiced by the leading questions. *Alghaben* at ¶ 30. *See also Howard* at ¶ 65 ("this was a trial to the court, and the judge was certainly able to distinguish between leading questions and sworn testimony"). In other words, we cannot say that the result of Bentz's trial would have been different. Therefore, Bentz's trial counsel was not ineffective for failing to object to the State's asking leading questions of K.A. during direct examination.

{¶143} Bentz's fifth assignment of error is overruled.

{¶144} Having found no error prejudicial to the appellant herein in the particulars assigned and argued in assignments of error two, four, and five, we affirm the judgment of the trial court as to those matters. Having found error prejudicial to the appellant herein in the particulars assigned and argued in

Case No. 1-16-17

assignments of error one and three, we reverse the judgment of the trial court as to those matters and remand for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**ZIMMERMAN, J., concurs.**

**/jlr**

**SHAW, J. dissents in part and concurs in part.**

{¶145} I respectfully dissent as to the conclusion of the majority under the Third Assignment of Error that the evidence of Kidnapping was insufficient because Bentz did not attempt an immediate "flight" from the residence following the commission of the rape and sexual battery. I concur in the disposition of all the other Assignments of Error and in all other aspects of the majority decision.

{¶146} The evidence establishes that Bentz forcibly placed or compelled the victim to hide in the closet following his commission of the rape and sexual assault for the express purpose of preventing her sister and her sister's boyfriend from discovering his sexual activity with the victim; thereby permitting every reasonable inference by the trier of fact that he did so with the purpose to avoid apprehension for those crimes. The Kidnapping statute requires only the restraining of another for the *purpose* to facilitate flight after the sexual assaults. It is thus Bentz' purpose *at*

*the time of placing the victim into the closet* that is the proper measure for reviewing the sufficiency of the evidence as to the elements of kidnapping. Whether Bentz later chose to abandon that purpose or was subsequently compelled by intervening circumstances to abandon that purpose is irrelevant.

{¶147} I agree with the majority to the extent that a defendant's immediate flight from the scene after the act of restraining the victim could certainly be one of several legitimate factors to be considered by the trier of fact in evaluating a defendant's purpose at the time the restraint was imposed. However, I do not believe an immediate physical departure from the scene is the sole and conclusive measure of the defendant's purpose to flee at the time the restraint of the victim was imposed. The majority appears to believe that it is.